**Sarah P. McINTOSH, Appellant,**

**v.**

**AETNA LIFE INSURANCE COMPANY, Appellee.**

**AETNA LIFE INSURANCE COMPANY, Appellant,**

**v.**

**Sarah P. McINTOSH, Appellee.**

**Nos. 5183, 5184.**

District of Columbia Court of Appeals.

Argued May 25, 1970.

Decided Aug. 3, 1970.

John A. McGuinn, Washington, D. C., with whom Guy Farmer, Washington, D. C., was on the brief, for appellant Sarah P. McIntosh.

James P. Schaller, Washington, D. C., with whom John L. Laskey, Washington, D. C., was on the brief, for appellee Aetna Life Ins. Co.

Before KERN, GALLAGHER and NEBEKER, Associate Judges.

NEBEKER, Associate Judge.

These cross-appeals are from a partial summary judgment. The trial court ruled against Aetna Life Insurance Company (hereinafter called Aetna) in awarding McIntosh, the beneficiary of a $16,000 group life insurance contract, a disputed amount of $7,000 in addition to the $9,000 which Aetna had paid upon proof of death of one Leo Proffit. The trial court, however, denied McIntosh's claim for prejudgment interest on the liquidated amount, punitive damages, and attorney's fees. We reverse the judgment only as it applies to the award of interest, and remand with instructions to modify the judgment so as to award interest from the date proof of death was furnished.

The affidavit and supporting documents reveal that this case arose under a master group life insurance contract between the E-Z-Go Car Division of Textron, Inc. (hereinafter called Textron) and Aetna. This contract allowed Proffit, the deceased employee, the option of obtaining life insurance and designating a beneficiary according to the terms of an insurance certificate. Proffit was employed with Textron as a salesman from May 1, 1963, until his death on October 29, 1967. Initially, Proffit had $15,000 insurance coverage under a contract which established the maximum amount of insurance according to job classification. On October 1, 1965, Textron entered into a new master insurance contract with Aetna establishing insurance limits according to "basic earnings". At that time Proffit's purported salary was $16,620 per year, consequently he requested and was granted $16,000 insurance coverage which was in force at the time of his death.[1] Of course, appropriate deductions were made from Proffit's salary to pay for that amount of life insurance.

McIntosh, the beneficiary, caused the necessary documents supporting the insurance

---

1. Insurance coverage was granted in $1,000 increments based on each $1,000 of basic earnings provided more than $3,000 was earned annually.

claim to be filed with Aetna. On December 26, 1967, Aetna transmitted $9,000 to Textron, which in turn transmitted it to McIntosh in complete settlement of her claim. She immediately requested an explanation from Textron and Aetna concerning the remaining $7,000 coverage which had been withheld. Textron replied that Proffit's salary was segregated into what it called basic earnings of $9,600 and $7,020 for "travel allowance", and that its insurance clerk misinterpreted the insurance contract in allowing coverage on the amount representing travel allowance.[2] This action was brought to obtain the remaining $7,000.

Referring to the employment contract, the trial court concluded that the travel allowance was a part of Proffit's basic earnings as that term was used in the master insurance contract. Since we hold that this conclusion was correct, we do not discuss the alternative holding of the trial court.

The insurance contract provides: "In the case of a Salesman, the term '* * * Basic Earnings' means the *total amount paid in salary*, amounts paid under a drawing account, and regular commissions, as determined by the Policyholder." (R. 41.) (Emphasis added.) Aetna contends that, as the "policyholder", Textron's designation of basic earnings is binding since the insurance contract left this function to Textron.

■ However, at the time the second insurance contract was negotiated using salary as a basis for coverage, Proffit was already employed with Textron. There is no evidence in the record that this employment contract was terminated and a new employment contract executed allowing Textron the right to designate what was or was not Proffit's basic earnings for insurance purposes as defined above. Absent such change in the relationship between Textron and Proffit, the original employment contract is the touchstone. The conduct of Textron when the amount of insurance was increased conclusively reflects that no change in the employment relationship was contemplated. Accordingly, Textron may not now assert a change in the employment status of Proffit.

■ Aetna argues that, in any event, in the original employment contract the travel allowance was not salary but reimbursement for travel expenses incurred by Proffit. Thus, it concludes that the additional $7,020 received by Proffit was properly excluded in computing coverage in the insurance contract. We disagree. Although the insurance contract does not define salary, there is nothing to indicate it was used in any special context. Webster's Third New International Dictionary 2003 (1969), defines salary as "fixed compensation paid regularly (as by the year, quarter, month, or week) for services". See also Black's Law Dictionary 1503 (4th ed. 1951), to the same effect. The evidence in the record indicates that Textron treated the basic earnings and the travel allowance as remuneration for Proffit's services. The letter Testron sent to McIntosh explaining the terms of Proffit's employment indicated that both the amount remitted for basic earnings and the "travel allowance" were for *his services*. The Statement of Earnings and Deductions and the Wage and Tax Statement for 1967 supplied by Textron also indicate that the entire amount was treated as compensation for services, and thus taxable income. There is absolutely no evidence in the record that the travel allowance was treated as a reimbursement for expenses. In fact, the evidence would compel a contrary finding. Thus, the total amount paid Proffit was basic earnings. See Webster's Third New International Dictionary 714 (1969), which defines earnings as "the balance of revenue

---

2. Assuming without deciding that Textron's insurance clerk made a unilateral mistake, Aetna has not demonstrated grounds for relief on this theory. *See* 3 Corbin on Contracts § 608 at 673 (1960) ; 17 Am.Jur.2d *Contracts* § 146 (1964).

for a specific period that remains after deducting related costs and expenses incurred".

■ Interest on this liquidated claim[3] was awarded only from the date of judgment and McIntosh appeals asserting interest was payable from the date proof of death was submitted. We agree. At common law, the right to receive interest on a liquidated debt accrued the date the debt was due.[4] D.C.Code 1967, § 15–131 (originally enacted as D.C.Code 1901, § 12, 31 Stat. 1191) in the pertinent part provides, " * * * judgments for money rendered by [the District of Columbia Court of Gentral Sessions] bear interest from their date until paid or satisfied, unless by the terms of the judgment interest runs from an earlier date." In enacting D.C.Code 1901, Congress stated in § 1640, 31 Stat. 1436:

> "Nothing in the repealing clause of this code contained shall be held to affect the operation or enforcement in the District of Columbia of the common law * * * except in so far as the same may be inconsistent with, or is replaced by, some provision of this code."

By use of the language "unless by the terms of the judgment interest runs from an earlier date", Congress specifically recogized that there are instances where such interest would be appropriate. The legislative history of this provision reveals that " * * * [t]he principal object in [the code] is to simplify and expedite all legal proceedings * * * and to afford more effective and complete remedies for wrongs". H.R.Rep.No.1017, 56th Cong., 1st Sess. 4 (1900). Therefore, we conclude that Congress did not intend to abrogate the common law in regard to the award of interest in judgments on liquidated amounts. Denial of prejudgment interest on such debts would deny rather than afford a remedy for refusing to pay the debt when it was due. Indeed, it would further encourage delay in paying liquidated claims, thus permitting free use of the money for the time period consumed in litigation. Obviously, Congress did not intend this to result from enactment of § 15–131, *supra*. *See also* D.C.Code 1967, § 15–108.

■ The denial of punitive damages in this case must be affirmed. McIntosh has not demonstrated that the breach by Aetna of its contractual obligation in refusing to recognize the claim for $7,000 assumed the character of a tort. Brown v. Coates, 102 U.S.App.D.C. 300, 303, 253 F.2d 36, 39 (1958); Den v. Den, D.C.App., 222 A.2d 647, 648 (1966). We believe this case falls squarely within the rule that there is no recovery for a malicious breach of contract. Minick v. Associates Inv. Co., 71 App.D.C. 367, 368, 110 F.2d 267, 268 (1940).

■ Likewise, the prayer for attorney's fees must be denied. It is the rule in the District of Columbia that, absent a contract or statutory provision or a showing that the defendant's conduct was willfully and oppressively fraudulent, attorney's fees are not generally allowed as damages or costs. Wolf v. Cohen, 126 U.S.App.D.C. 423, 426, 379 F.2d 477, 480 (1967); Murphy v. O'Donnell, D.C.Mun.App., 63 A.2d 340, 342 (1948). The facts of this case do not indicate a basis for such an award.

Affirmed in part, reversed in part, and remanded with instructions.

---

3. Claims for insurance are liquidated debts. *See* Messina v. Mut. Benefit Health & Accident Ass'n, 228 F.Supp. 865, 871 (D.D.C.1964), aff'd, 121 U.S.App.D.C. 328, 350 F.2d 458 (1965), cert. denied, 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1966). See also 15 Couch on Insurance 2d § 52.10 (1966).

4. Lichtenberg v. Joyce, 183 Md. 689, 39 A.2d 789, 792–793 (1944); McShane v. Howard Bank, 73 Md. 135, 20 A. 776, 781 (1890).