FLIPPO CONSTRUCTION COMPANY, INC., Appellant,

v.

MIKE PARKS DIVING CORPORATION, Appellee.

No. 86–363.

District of Columbia Court of Appeals.

Argued Jan. 8, 1987.
Decided Sept. 17, 1987.

Robert F. Leibner, Washington, D.C., for appellee.

Alan S. Anderson, Washington, D.C., for appellant.

Before PRYOR, Chief Judge, and FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

Appellant Flippo Construction Company, Inc. ("Flippo"), the plaintiff general contractor, challenges the trial court's entry of judgment, after a bench trial, in favor of the defendant subcontractor, appellee Mike Parks Diving Corporation ("Parks"), on Flippo's $56,920 claim for breach of a contract to perform certain repairs on the East Basin Drive Bridge.[1] Flippo contends the trial court erred: (1) in allowing Parks to present defenses of mistake and misrepresentation, which Parks had failed to plead before trial; (2) in admitting certain parol evidence, offered by Parks, as to the parties' intentions under the contract; and (3) in concluding no contract existed because there had not been a "meeting of the minds" on a material term.[2] Although we reject Flippo's first two assertions of error, we agree with the third. We therefore reverse and, under the circumstances, must remand for a new trial.

## I.

In September 1982, Flippo contracted with the Federal Highway Administration (FHA) to repair the East Basin Drive Bridge. This prime contract included concrete repairs to the abutments and pier walls of the bridge, as well as repairs to an ice fence. The first item required underwater application of concrete, and the contract called for the use of a particular fast-setting high strength concrete patch-

---

1. Parks filed a counterclaim which the trial court rejected because "Parks offered no evidence to establish the value of the work that he performed on the subcontract." Parks does not challenge this ruling on appeal; we therefore do not address it.

2. *Additionally,* Flippo claims the trial court erred in ordering rescission of the contract rather than compelling Parks to affirm the contract and sue for damages. Flippo contends that, by continuing to work on the job after discovering the facts supporting Parks' rescission claim, Parks elected suit on the contract as its exclusive remedy. *See Dresser v. Sunderland Apartments Tenants Ass'n, Inc.,* 465 A.2d 835, 840 (D.C.1983). Because Flippo failed to argue this contention to the trial court, we will not consider it on appeal. *Chase v. Gilbert,* 499 A.2d 1203, 1209 (D.C.1985).

ing compound: "Speedcrete Blue Line (Special Underwater Formula) or approved equal."

Flippo requested bids from subcontractors for the labor portions of these two items (Flippo was to provide all the materials and supplies). Flippo required bids with a fixed total labor cost rather than bids based simply on an hourly rate. According to Flippo's project manager, Paul Altman, Jr., Parks' bid was the only one responsive to this fixed sum requirement. Specifically, Parks' initial bid on March 4, 1983 was for a sum not to exceed $18,680 for the repairs to the abutments and pier walls.[3] Parks' bid anticipated twenty days of labor and provided a detailed estimate of the cost of using fiberglass forms as the method of repair. The bid did not mention Speedcrete.

During further negotiations in March 1983, Parks requested three modifications of the original specifications. First, it asked to use a waterblaster instead of a chipping hammer to remove damaged concrete. Second, Parks proposed to use 4,000 p.s.i. concrete instead of Speedcrete to repair the ice fence. Third, and most important, Parks asked to substitute fiberglass forms for Speedcrete to repair the abutments and pier walls. Flippo agreed to present these requests to FHA.

It is unclear how hard Flippo actually pressed FHA for Parks' third requested modification. Flippo's project manager, Altman, testified that he had orally discussed with FHA the substitution of fiberglass forms for Speedcrete.[4] He added, however, that because FHA had insisted on Speedcrete, he did not pursue the matter further when he wrote to FHA on March 9, 1983 requesting the other two modifications for Parks. Indeed, in that letter Altman stated the repairs to the abutments and walls would be done "using the Speedcrete formulae as previously submitted and approved." In its reply of March 28, FHA agreed to the two modifications, permitting use of a waterblaster and 4,000 p.s.i. concrete for the ice fence. This March 28 letter, which was later attached to the subcontract signed by Flippo and Parks on April 25, 1983, contained no reference to the use of Speedcrete for the repair of the abutments and walls. The trial court did not clearly resolve the factual dispute over Flippo's pursuit of this requested modification, but the court did find "there is not a clear showing that Flippo fully presented to the FHA the alternative method of fiberglass forms."[5]

There was also a factual dispute over what Flippo had told Parks about the use of Speedcrete for the major portion of the subcontract. Altman testified that he had informed Parks of the need for Speedcrete at a March 9 meeting, before sending the letter to FHA:

Q. [By Flippo's counsel] What was the substance of that meeting?

A. It was that the—it appeared that Federal Highway [FHA] would not accept any alternates to the Speedcrete solution and that we would be willing to discuss, you know, his prices for doing the Speedcrete in accordance with the contract specifications, which we did. As a result, the subcontract was formulated from that.

\* \* \* \* \* \*

Q. [By Parks' counsel] So wasn't it your intention to mislead Mr. Parks into believing that his request as communicated to you had been presented to the FHA and approved?

\* \* \* \* \* \*

3. The final agreed upon lump sum for both items was $23,000: $18,680 for the concrete repairs and $4,320 for repairs to the ice fence.

4. Charles Burke, Jr., an FHA project engineer, testified he recalled that, before work on the job had begun, there had been "some problem" with respect to using an alternative to Speedcrete (presumably Flippo's presentation of Parks' request to use fiberglass forms instead of Speedcrete). He could not, however, recall precisely what had occurred, except that no approval had been given for anything other than Speedcrete.

5. At the trial itself, the judge appeared to be under the impression that Flippo had made no presentation of the alternative method of repair to FHA. The judge was particularly influenced by the fact that Flippo's March 9 letter did not mention an alternative to Speedcrete.

A. Absolutely not. At the subsequent meeting we had between the 2nd of March and the date this letter was written [March 28], it was expressed to Mr. Parks that anything other than Speedcrete would be wholly unacceptable to the Federal Highway [Administration] due to its usage as an experimental project on this project.

Altman further testified that, at this point, Parks did not request any modification of its original bid to perform the work.

To the contrary, Mike Parks, the owner of Mike Parks Diving Corporation, testified that Altman never had told him Flippo had informed FHA that Speedcrete was going to be used. Parks added that he did not see Flippo's March 9 letter to FHA confirming the use of Speedcrete until after the lawsuit had been filed. He stated his "understanding was that we were going to try for the approved equal and not use the Speedcrete." Indeed, Parks also testified that even after receipt of the March 28 letter from FHA, Flippo had informed him it was still making efforts to gain approval for an alternative to Speedcrete. He further stated that Altman did not inform him that FHA had indicated that it would not allow a substitute for Speedcrete.

The evidence admitted at trial did not make clear what Mike Parks' understanding ultimately was with respect to using Speedcrete for the major repair work.[6] In its brief, Parks initially claims its "lump-sum bid of $23,000 for twenty days of labor was dependent upon using all three of the aforementioned modifications to the prime contract specifications. Parks never contemplated the use of Speedcrete, and never submitted a bid which included the term." The record does confirm that Parks' original bid for the job did not mention Speedcrete and was based on twenty days of labor using the fiberglass forms alternative. Furthermore, in a portion of

his deposition admitted into evidence at trial, Mike Parks stated that he had made his bid "based on an alternate method of repair." In a May 27 letter to Altman, moreover, Parks stated his version of an April meeting with Altman when they discussed FHA's March 28 response to the earlier requested modifications: "I also told you in our meeting in your office when we discussed John D'Angelo's letter of March 28, 1983 that if the Fed. Highway Admin. held us to the original contract requirements 'we would have to do something different with respect to the original contract requirements.' Unfortunately, I did not feel it necessary to include this as part of the existing contract." Parks also testified that at this meeting he "asked [Altman] about the approved equal, my fiberglass forms." All this evidence suggests Parks understood that if an alternative to Speedcrete were not approved, he would not have to complete the job as originally bid.

On the other hand, Parks states a different position in a later part of its brief as follows: "Parks never assumed *approval* would be forthcoming; Parks assumed *presentation* of his modifications would be forthcoming." (Emphasis added.) At oral argument, moreover, Parks' counsel acknowledged that if Flippo had made every effort to gain approval of the fiberglass forms but FHA had still insisted upon Speedcrete, then Parks would have been obliged to complete the work using Speedcrete. These remarks imply that Parks was aware Speedcrete was required unless approval for an alternative could be obtained, but that it believed Flippo would make every effort to obtain the modifications from FHA. Taken as a whole, Parks' evidence and argument may suggest that Mike Parks recognized Flippo only had a contract obligation to press FHA for permission to use an alternative to Speedcrete, but that he believed Flippo would have little difficulty in obtaining approval and,

---

**6.** One early indication of this confusion is Parks' response to one of Flippo's interrogatories. Flippo asked Parks to "[i]dentify at what point in time in the course of the project Parks ascertained that 'Speed-Crete' was to be utilized in the repair process. Describe the manner by which Parks learned of such requirement." In re-

sponse, Parks stated that he "learned that Speedcrete *or a like product* was to be used when he reviewed the job specifications." (Emphasis added.) Aside from being unresponsive to the question, Parks' reference to "a like product" does not clarify his understanding with respect to the use of Speedcrete.

accordingly, took the modifications for granted.

In any event, Parks and Flippo executed the subcontract on April 25, 1983, incorporating the two modifications approved by FHA, as evidenced by the March 28 letter. The original requirement that Parks use "Speedcrete ... or approved equal" to repair the abutments and pier walls remained in the subcontract, unaltered. Parks began work on the same day. On May 6, however, Parks discontinued work on the concrete repairs. Mike Parks testified that he did so because he was told that day, for the first time, that Speedcrete would be required for all the concrete repair portions of the job. According to Flippo, however, Parks knew in early March that Speedcrete was required and stopped work after complaining about problems it had experienced in applying Speedcrete. Parks then requested a change in the subcontract payment terms from a fixed sum to a payment based on "time and materials." Flippo said no.

Parks performed no work on the project between May 7 and May 16. After May 16, Parks worked on the ice fence repairs but did no more work on the abutments or pier walls. On June 28, 1983 Parks left the project permanently. Flippo completed work on the concrete repairs at its own expense and presented evidence that it incurred costs of $79,920.[7] Flippo has not paid Parks any money for its work on the project. *See supra*, note 1.

## II.

█ Initially, Flippo claims the trial court erred in allowing Parks to present at trial its defenses of mistake and misrepresentation, because Parks had failed to state these defenses in either its answer or its counterclaim. We agree that Super.Ct. Civ.R. 8(c)[8] requires a party to "set forth

affirmatively ... fraud ... and any other matter constituting an avoidance or affirmative defense." Moreover, we have held that, generally, "the failure to raise affirmative defenses constitutes a waiver of those defenses." *Goldkind v. Snider Brothers, Inc.*, 467 A.2d 468, 471 (D.C.1983). As the federal court of appeals for the fifth circuit recently stated, however, " 'Where [an affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise, ... technical failure to comply precisely with rule 8(c) is not fatal.' " *Bull's Corner Restaurant, Inc. v. Federal Emergency Management Agency*, 759 F.2d 500, 502 (5th Cir.1985) (quoting *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855 (5th Cir.1983)); *see also Baker v. City of Detroit*, 483 F.Supp. 919, 921 (E.D.Mich.1979) ("[W]hat matters is not whether the magic words 'affirmative defense' appear[ ] in the pleadings, but whether the Court and the parties were aware of the issues involved"), *aff'd*, 704 F.2d 878 (6th Cir.), *modified on rehearing on other grounds*, 712 F.2d 222 (6th Cir. 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

This court has also held on several occasions that a defendant's failure to plead an affirmative defense should not result in a loss of the defense. Most recently, in *Word v. Ham*, 495 A.2d 748 (D.C.1985), a suit based on an installment land sales contract, we held that appellants' failure to plead a waiver in their answer or counterclaim did not warrant prohibiting them from raising that defense. Because appellants' motion for summary judgment put appellees on notice of the defense and allowed them an opportunty to respond, we concluded that appellees had not been prejudiced by appellants' earlier failure to comply with the rule. *Id.* at 751; *see also Goldkind*, 467 A.2d at 472 (because both

---

7. Because the trial court ruled that Flippo was not entitled to damages on its breach of contract claim, it did not make any finding as to whether Flippo had proved its damages. Flippo's claim for $56,920 derives from its $79,920 in alleged costs of completion minus the $23,000 payable to Parks under the subcontract. We express no opinion on this issue.

8. Super.Ct.Civ.R. 8(c) is identical to Fed.R.Civ.P. 8(c). We may look to cases interpreting the federal rule "as persuasive authority in interpreting [the local rule]." *Goldkind v. Snider Brothers, Inc.*, 467 A.2d 468, 472 (D.C.1983) (quoting *Vale Properties, Ltd. v. Canterbury Tales, Inc.*, 431 A.2d 11, 13 n. 3 (D.C.1981)).

parties were aware of *res judicata* and collateral estoppel issues, failure to raise them as affirmative defenses in answer to cross-claim did not result in waiver of defenses); *Jackson v. District of Columbia*, 412 A.2d 948, 951–52 (D.C.1980) (failure to amend answer to include collateral estoppel defense did not result in loss of defense where no prejudice to opponent); *Wright v. McCann*, 122 A.2d 334, 335–36 (D.C.1956) (failure to raise setoff defense in answer did not result in loss of defense where opponent had actual notice of defense).

■ Parks concedes that he did not raise the defenses of mistake and misrepresentation in his answer or counterclaim. The record amply demonstrates, however, that Flippo had notice of both defenses before trial. In his deposition of December 13, 1984—almost eighteen months before the trial—Mike Parks clearly indicated that mistake and misrepresentation would constitute the crux of Parks' defense. As to mistake, he claimed that he first found out Speedcrete was the only acceptable material on May 6, 1983, after he had begun work on the job. He added that his initial estimate of $18,630 was based on his "previous experience with fiberglass forms" and that he had not bid the job contemplating use of Speedcrete. Parks also asserted his understanding that, if Flippo "required us to do something other than my suggested method of repair, we would have to modify [the contract]." Finally, Parks unequivocally said there was "no way" he would have agreed to a contract that required the use of Speedcrete. These statements [9] demonstrate that central to Parks' defense was an assertion he did not believe he was limited to using only Speedcrete to complete the job. Clearly, that is a defense of mistake.

Mike Parks also asserted in his deposition that Flippo's misrepresentations were the reason for his understanding about the use of Speedcrete. His responses to questions posed by Flippo's counsel leave no

doubt as to the defense he intended to assert:

Q. Mr. Parks, do you contend that prior to the time you executed the subcontract with Flippo that any representative of Flippo made any misrepresentation to you concerning any aspects of the project that you were involved in?

A. Yes, sir.

Q. Can you tell me what that or those misrepresentations were?

\* \* \* \* \* \*

A. Two major misrepresentations were to the method of cleaning the concrete and the method of repair.

\* \* \* \* \* \*

Q. What do you mean by [method of repair]?

A. I was led to believe [by Paul Altman] that we were going to use one of my alternate methods of repair instead of Speedcrete.

In addition to Mike Parks' deposition, the April 1985 pretrial memorandum explicitly sets forth Parks' mistake and misrepresentation defenses. Under the heading "Concise Statement of Defendant's Defenses," Parks asserted "that Flippo made major misrepresentations prior to the execution of the subcontract as to the method of repair and cleaning which Parks would be allowed to use; and that Flippo knew or should have known that the bid submitted by Parks prior to entering into the subcontract was based upon Parks' intended utilization of a method of repair and cleaning which Flippo intended to prevent Parks from using for the project." We also note that Parks' "Trial Memorandum," dated the day of trial, clearly set out the mistake and misrepresentation defenses. In light of Parks' deposition responses and his pretrial and trial memoranda, therefore, Flippo cannot now complain it did not receive fair notice that Parks was relying on mistake and misrepresentation.

---

**9.** Many of these statements were not admitted into evidence at trial, but we may consider them in determining whether Flippo had fair notice of Parks' mistake and misrepresentation defens-

es. We also note that, while these statements seem to clarify Parks' claimed understanding of the contract, they were not before the trial court as evidence.

Finally, we add that as long as an issue is "expressly or impliedly tried by consent of the parties," regardless of whether it is raised in the pleadings, the trial court is required to resolve it. *Moore v. Moore*, 391 A.2d 762, 768 (D.C.1978). A review of the trial transcript reveals that Flippo impliedly, if not explicitly, agreed that these issues be tried. In his opening statement, counsel for Parks raised the mistake and misrepresentation defenses, couching them in the assertion that there had been no "meeting of the minds" with respect to whether the contract required the use of Speedcrete for the concrete repairs. Flippo did not object. Later, Parks' cross-examination of Altman was clearly an attempt to establish the mistake and misrepresentation defenses; Flippo did not object on the ground that these defenses had not been properly pleaded. Counsel for Flippo did object to the admission of several documents offered by Parks, including the initial bid. Flippo contends this objection shows it did not consent to the trial of the mistake and misrepresentation defenses. We disagree. Flippo's objections were not based on the nature of Parks' defenses but, rather, on the claim that the specific documents should not be admitted into evidence because they had not been listed in the pretrial order as possible exhibits. Indeed, Flippo did not cite Parks' failure to assert the mistake and misrepresentation defenses until after the conclusion of all the evidence. Consequently, the trial court did not err in considering those defenses; Flippo not only had timely notice but also impliedly consented to having the defenses tried.

### III.

Flippo also contends the trial court erred in admitting parol evidence of the parties' intentions under the contract. Flippo argues that, because the contract was not ambiguous, the trial court could not admit parol evidence to interpret it. This claim has no merit. We adhere to the "objective law" of contracts and have previously set out the criteria for consideration of parol evidence:

> Where as here a contract contains an integration clause (*i.e.*, providing that the contract sets forth all promises, agreements, conditions and understandings between the parties), the "written language embodying the terms of an agreement will govern the rights and liabilities of the parties ... unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake." *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 371, 137 A.2d 687, 693 (1958) cited in *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 786 (D.C. 1968).

*Scrimgeour v. Magazine*, 429 A.2d 187, 188 (D.C.1981); *see also Rice v. Rice*, 415 A.2d 1378, 1380 n. 1 (D.C.1980).[10] Thus, even if we were to accept Flippo's contention that the written contract was not ambiguous, an issue we do not reach, the trial court properly admitted parol evidence to evaluate Parks' mistake and misrepresentation defenses.[11]

---

10. *Scrimgeour v. Magazine*, 429 A.2d 187, 188 (D.C.1981) does not limit parol evidence to cases involving mutual mistake. Parol evidence is also admissible when a party alleges a unilateral mistake. *See Stamenich v. Markovic*, 462 A.2d 452, 455 (D.C.1983) ("[W]hen fraud, mistake, or duress is alleged, the admission of parol evidence to vary the express terms of a contract may be proper."); *Vakas v. Manuel*, 114 U.S. App.D.C. 368, 369, 316 F.2d 369, 370 (1963) (parol evidence admissible where reformation of contract sought to make mistaken writing conform to parties' antecedent agreement); RESTATEMENT (SECOND) OF CONTRACTS § 153 comment (a) (1981) (parol evidence rule does not preclude admission of prior negotiations to show mistake).

11. We reject Flippo's additional argument that the trial court erred in admitting documents that were not listed in the Pretrial Proceedings Order. "Rigid adherence" to the pretrial order is not required, and the trial court did not abuse its discretion in allowing Parks to introduce the documents. *Taylor v. Washington Hospital Center*, 407 A.2d 585, 592 (D.C.1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980). Parks did not attempt to introduce new legal theories or dramatically to alter its defense; rather, Parks sought introduction of documents that were known to Flippo far in advance of trial.

## IV.

We turn now to the merits of the trial court's ruling that Parks and Flippo had not entered into an enforceable contract.

### A.

According to the trial court:

In order for an enforceable contract to exist, there must be an agreement between the parties on the material terms of the contract: there must be a "meeting of the minds." In this case, *there clearly was not a "meeting of the minds" on the material term of whether or not the fiberglass forms alternative would be acceptable as an "approved equal" to Speed Crete for the concrete repairs portion of the subcontract.* Parks' bid of $23,000.00 was based on the understanding that *Flippo was attempting to obtain approval for the fiberglass forms alternative* to Speed Crete as an acceptable equal. This bid is so far below any other bid made to complete the work under the subcontract while using Speed Crete and is so far below the actual cost to Flippo to complete the work ($79,920.00) that there could not have been a "meeting of the minds" to create an enforceable contract. *Flippo knew or should have known that Parks' bid was based on a mistake in a material term of the contract.* Flippo is in the same position in which it would have been had Parks not made his bid based on a mistake in a material term of the subcontract.

[Emphasis added.]

■ The trial court's order reflects confusion as to Parks' understanding about Speedcrete. In its findings of fact, the court found Parks had "estimated that the project would take 20 working days to complete *provided that Flippo would make three modifications* to the project specifications and plans." (Emphasis added.) Consistent with this finding that Parks, in effect, had premised its bid on a Speedcrete substitute, the court stated in its conclusions of law quoted above that the parties' minds had not met on "whether or not the fiberglass forms alternative *would be acceptable* as an 'approved equal' to Speed Crete." In the very next sentence, however, the court apparently stated a different understanding: "Parks' bid of $23,000 was based on the understanding that Flippo *was attempting to obtain approval* for the fiberglass forms alternative to Speed Crete as an acceptable equal." (Emphasis added.) The court did not explicitly indicate Parks had a different understanding at the time of executing the subcontract. Thus, it is unclear whether the trial court believed Parks mistakenly had premised its execution of the subcontract (1) on an understanding that FHA would approve a Speedcrete substitute, or (2) merely on an understanding that Flippo would use its best efforts to obtain such approval, failing which Parks would have to use Speedcrete. (Interestingly, this confusion is the same as that reflected in Parks' brief and oral argument on appeal, *see supra,* Part I at 264–267.) In short, it is unclear which of the two possible mistakes the trial court believed Flippo "knew or should have known" Parks was making.[12]

■ The trial court's decision is based on a theory of "unilateral mistake" as a valid defense to a contract claim. Assuming, for the moment, the validity of that defense, we note that the ambiguity in the trial court's ruling must be resolved before we can know whether Parks is entitled to a judgment in his favor.[13] Because this

---

12. Two of the trial court's factual findings indicate that the court did credit Mike Parks' account of his meetings with Altman. First, the court found that, after Flippo's receipt of the March 28 letter from FHA (at a time when, according to Altman, Flippo already had agreed with FHA that Speedcrete would be used), "Flippo indicated to Parks that they were still trying to gain approval for the fiberglass forms as an 'approved equal' to Speed Crete." Second, the trial court also found it was not until May 6, approximately 10 days after the subcontract had been signed, that "Parks was first informed that Speed Crete was *required* to be used on this project." (Emphasis in original.) But even these findings do not resolve the serious ambiguity in the trial court's conclusions of law.

13. The trial court's failure to make a clear finding as to the type of mistake by Parks it was talking about has significant implications. Assume, first, that Parks executed the subcontract

court does not sit as a finder of fact, we cannot resolve this ambiguity; thus, a remand is required. Furthermore, as we shall elaborate below, for a party to prevail on a unilateral mistake defense, he or she must show that the other party bears the risk of mistake. Because the trial court did not address this issue, a remand is also required for that reason. We therefore turn to the nature and elements of the unilateral mistake defense.

### B.

"Unilateral mistake" can be a defense even in the absence of fraud (or misrepresentation), duress, or undue influence; generally speaking, it is enough that one party is reasonably mistaken about a material aspect of the contract and that the other party knew or should have known of that erroneous understanding. To the contrary, Flippo urges us to adopt the rule that, "absent intentional, culpable conduct, such as fraud, duress or undue influence, a unilateral mistake is ordinarily not a ground for relief from a contract." *Creamer v. Helferstay*, 294 Md. 107, 121, 448 A.2d 332, 339 (1982).

This court has had only one occasion to address, in any meaningful manner, a defense based on unilateral mistake. In *Simons v. Federal Bar Building Corp.*, 275 A.2d 545, 551 (D.C.1971), we rejected the conclusion that only "mutual mistakes" warranted relief:

It has been frequently assumed or stressed ... that the mistake [must] be mutual before relief can be granted. Professor Corbin cautions against molding such a generalization into a rigid rule of law. He wisely points out that the classification of mistakes as either "mutual" or "unilateral" is seldom accompanied by definition or analysis and that cases do not readily fall into one category or the other. Relief has been granted where the mistake has been denominated "unilateral" and also where it is held that the contract lacks mutuality even though the error resulted from the miscalculation of only one party. Fairness will best be served by weighing the circumstances surrounding the mistake rather than the application of mechanical rules which ignore the real nature of the situation. [Footnotes omitted.]

Applying this standard, we upheld a claim of mistake where the landlord had written .015% instead of 1.5% in a recent escalation clause and the tenant attempted to enforce the literal terms of the written agreement. In holding the tenant bound to the 1.5% increase, we noted, first, that the landlord had notified the tenant of the error two years before invoking the escalation clause. We also noted that, aware of the error but before notification, the tenant had attempted to bind a prospective subtenant to the 1.5% figure. Finally, we stressed that the tenant could not have placed any "significance or reliance" on the error until he had been notified about it

on the mistaken understanding that FHA would approve a Speedcrete substitute. Also assume that Flippo knew or should have known of Parks' mistake. Because FHA did not approve a substitute and the costs of using Speedcrete far exceeded Parks' bid, Parks would have suffered a financial loss unless excused from the subcontract on the basis of his mistake. Thus, this particular mistake easily would have justified rescission if all other elements of the "unilateral mistake" defense were satisfied.

Now assume, alternatively, that Parks, in signing the subcontract, understood Flippo would forcefully present the fiberglass forms alternative to FHA (in effect, a "best efforts" warranty) but that FHA would not necessarily approve. Assume, further, that Flippo did not press FHA. Assume, finally, that there was no likelihood FHA would have approved an alternative to Speedcrete even if pressed. Under these cir-

cumstances, because Parks at most could have expected an effort from Flippo, not necessarily success in avoiding Speedcrete, and because Flippo could not have succeeded for Parks in any event, any allegation that Parks mistakenly perceived Flippo's intention to press FHA might state a claim for breach of contract but not necessarily justify rescission or damages. On the other hand, change the third assumption to say that FHA would have relented if pressed. Or add a further assumption that Flippo predicted in good faith to Parks that FHA almost certainly would approve a substitute for Speedcrete. In these latter situations, Parks' reliance on Flippo's prediction of FHA's position on Speedcrete could have induced Parks to sign the subcontract in the mistaken belief that Speedcrete need not be used—to Parks' demonstrable damage.

and, in any event, that the 1.5% reflected the actual agreement of the parties. Until now, we have not had occasion to address the unilateral mistake defense since our decision in *Simons*.[14]

This case differs from *Simons* in a significant respect. In *Simons*, the mistake was unilateral only in the sense that one party, acting as scrivener, made a clerical error reflecting a mistake as to what both parties clearly had agreed. Although the mistake, therefore, may have been technically unilateral, it reflected an accidental departure from a mutually agreed contract term. In the present case, however, Parks' alleged mistake as to the required method of performance reflects a substantial departure from the terms of the contract as written and as allegedly understood by Flippo; in contrast with *Simons*, there is a genuine issue here as to whether there had been a "meeting of the minds."

Accordingly, it is necessary to apply a more thorough analysis than that established in *Simons*—a decision of this court that leaves room to adopt a more comprehensive standard to govern issues more complex than those we addressed in that case. We continue to recognize, however, that "mechanical rules" are not appropriate for resolving issues of mistake; thus, the standard we announce not only is consistent with *Simons* but also contains sufficient flexibility to account for the "real nature of the situation." *Id.*

### C.

We adopt the approach of the RESTATEMENT (SECOND) OF CONTRACTS §§ 153, 154 (1981):

Section 153:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable,[15] or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Section 154:

A party bears the risk of mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Flippo contends, first, that the trial court's findings that Flippo "knew or should have known," *see id.* § 153 (b), "Parks' bid was based on a mistake in a material term of the contract" (use of fiberglass forms instead of Speedcrete) is clearly erroneous. *See* D.C. Code § 17–305 (1981); *Bell v. Jones*, 523 A.2d 982, 992 (D.C.1987) (as amended); *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 546 (D.C.1981). Flippo attacks the trial court's apparent reliance on two subsidiary facts: (1) Parks' bid was "far below" any other, and (2) Flippo's actual cost of completing the work was substantially higher than Parks' bid. While it may be true that,

---

**14.** We have referred to the unilateral mistake defense in one other case. In *McIntosh v. Aetna Life Insurance Co.*, 268 A.2d 518, 520 & n. 2 (D.C.1970), decided before *Simons*, we held that, assuming an insurance company had made a unilateral mistake in permitting life insurance coverage based on the amount of an employee's travel allowance in addition to his basic earnings, it "has *not* demonstrated grounds for relief on this theory." We cited 3 CORBIN ON CONTRACTS § 608 at 673 (1960) and 17 AM.JUR.2d, *Unilateral Mistake or Error* § 146 (1964), for our conclusion but did not discuss the issue further. Clearly, nothing we said in *McIntosh* precludes our elaboration here on the contours of a unilateral mistake defense.

**15.** Parks did not claim that enforcement of the contract would be unconscionable, and the trial court made no finding in that regard. We therefore do not address the applicability of RESTATEMENT (SECOND) OF CONTRACTS § 153(a) to this case.

standing alone, these two subsidiary factual findings are not sufficient to support the trial court's ultimate finding that Flippo knew or should have known that Parks was executing the subcontract on the basis of a mistaken understanding,[16] that finding—as far as it goes—is amply supported by other evidence. The trial court credited Parks' account in two crucial respects. It found Flippo continued to assure Parks that Flippo was still attempting to gain approval for an alternate to Speedcrete when, in fact, Flippo already had agreed with FHA that Speedcrete would be used. *Supra* note 12. The court also found that Parks had signed the subcontract. *Supra* note 12. In making these findings, the trial court had to determine credibility based on Parks' and Altman's contradictory accounts of, for example, the March 9, 1983 meeting. "[S]ince the trial court heard the testimony and was in a position to evaluate the witness' credibility, we defer to its resolution of conflicts in the testimony." *Brown v. Brown*, 524 A.2d 1184, 1186 n. 2 (D.C.1987) (quoting *Auxier v. Kraisel*, 466 A.2d 416, 418 (D.C.1983) (per curiam, as amended)).

These findings are sufficient to support the trial court's ultimate finding that Flippo knew or should have known that Parks was acting under some kind of mistaken belief with respect to the use of Speedcrete—clearly, as the trial court put it, "a mistake in a material term of that contract." As noted earlier, however, this ultimate finding is not precise enough to determine whether Parks is entitled to a judgment. *Supra* note 13. Thus, a remand is required.

In order for Parks to prevail on a defense of unilateral mistake, moreover, it is not enough to show that Parks relied on a mistake that Flippo knew or should have known about. Parks also must demonstrate that, under the circumstances, Parks "does not bear the risk of the mistake." RESTATEMENT (SECOND) OF CONTRACTS § 153. The trial court made no finding in this regard, and, on the record before us, we cannot resolve the issue as a matter of law. Relevant factors point to both parties. Although the subcontract does not assign the risk of mistake to either party, any mistake by Parks would appear to be at odds with

**16.** As to the first subsidiary fact, it is not entirely clear whether the trial court considered the disparities between Parks' bid and the initial bids of other companies or relied only on the disparities between Parks' bid and those Flippo received after Parks had left the job. In any event, the record does not support a finding that, when Flippo initially received bids to perform the repairs, it should have known of Parks' alleged misunderstanding that fiberglass forms could be used instead of Speedcrete. The record shows that Parks submitted the only bid that contained a fixed total cost; the other bids Flippo received at that time—"one or two," according to Altman—were based on time and materials and contained no maximum total cost. The court, therefore, had no indication that these other, non-responsive bids had estimated a total cost significantly higher than the total in Parks' bid. Moreover, Parks itself presented no evidence from which one could infer that the difference between Parks' bid and those of other companies was based on Parks' mistaken view that Speedcrete was not required for the concrete repairs.

The trial court did attach significance to bids received to complete the work after Parks had left the job, as well as to the actual cost of the concrete repairs Flippo had to undertake itself. For example, the trial court noted that one of these bids was for $60,000, far in excess of the

$18,680 originally bid by Parks. Flippo also presented uncontradicted evidence that it spent $79,920 to complete the concrete repairs using Speedcrete. These sums, however, cannot easily be used to infer that Flippo knew, or had reason to know, at the time Parks submitted its bid (or at the time the subcontract was signed) that Parks based its price of $18,680 on a misunderstanding of a material aspect of the contract. No evidence was introduced to link these later bids or Flippo's eventual costs of undertaking the repairs to its prior knowledge of how much they would cost. Absent such an evidentiary link, the fact that these later bids and the eventual costs of completing the repairs were significantly higher than the bid Parks had submitted is not clearly relevant to the inquiry as to whether or not, months earlier, Flippo knew or had reason to know that Parks' bid was based on a belief that fiberglass forms could be used.

Furthermore, Flippo introduced evidence, unaddressed by the trial court, to demonstrate that it had no reason to know Parks' bid was based on a material misconception. Before seeking bids, Flippo, which had had no experience with Speedcrete, had engaged a consulting firm to estimate the labor costs for completing the concrete repairs. Flippo received an estimate of $14,000. That this estimate proved incorrect does not necessarily lead to the conclusion that Flippo could not reasonably have relied on it in evaluating the bids received.

what is arguably the plain language of the contract, which says nothing about Flippo's willingness to pursue, or FHA's willingness to approve, a Speedcrete substitute. *See* RESTATEMENT (SECOND) OF CONTRACTS § 154 comment (d), illustration (6). On the other hand, Flippo's representations that it was continuing to lobby FHA to gain approval of an alternative to Speedcrete, *supra* note 12, as well as Flippo's apparent failure to inform Parks before May 6 that Speedcrete was required, *supra* note 12, could lead a fact-finder reasonably to conclude "it is reasonable in the circumstances" to allocate the risk of mistake to Flippo. *See* RESTATEMENT (SECOND) OF CONTRACTS § 154(c). We emphasize, however, that, on this record, neither result appears particularly compelling, and we express no view on how this issue should ultimately be resolved.

Absent a finding that Flippo bore the risk of Parks' mistake, however, the trial court could not have concluded that Parks made out a valid defense of unilateral mistake. Accordingly, for this reason, too, we must reverse the judgment for Parks.

### V.

Although we reverse the trial court's ruling for Parks based on unilateral mistake, Parks is still entitled to consideration of that defense in light of the unresolved issue: who bore the risk of mistake? Moreover, because the precise nature of Parks' mistake may be crucial to the eventual outcome of this suit, *see supra* note 13, a definitive finding on this issue is also required.

The trial court also declined to rule on Parks' misrepresentation defense. The court's only reference to misrepresentation was its factual finding "there is not a clear showing that Flippo fully presented to the FHA the alternative method of fiberglass forms." We cannot say the trial court meant to rule on Parks' misrepresentation defense with this finding, especially because, in light of its decision for Parks on *the* ground of unilateral mistake, a resolution of this issue was not necessary. Because witness credibility is so important to

a proper resolution of the alleged misrepresentations, this court cannot rule on those questions. Accordingly, Parks is entitled to a trial court ruling on his misrepresentation defense.

In the ordinary course, we would remand the case for the trial court to consider, on the trial record, the remaining issues on the unilateral mistake defense, as well as Parks' alternative defense of misrepresentation. Because the trial judge has since retired from the bench, however, we cannot do so here. We therefore must reverse and remand for a new trial.

*Reversed and remanded.*