914 F.2d 255
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CINCINNATI INSURANCE CO., and Cincinnati Casualty Co.,
Plaintiffs-Appellants,
v.
David C. AVERY, et al., Defendants-Appellees.
 No. 89-5536.
 United States Court of Appeals, Sixth Circuit.
 Sept. 12, 1990.
 
 1
 Before KENNEDY and ALAN E. NORRIS, Circuit Judges; GADOLA, District Judge.*
 
 
 2
 ALAN E. NORRIS.
 
 
 3
 Plaintiffs Cincinnati Insurance Company and Cincinnati Casualty Company ("the companies") filed a declaratory judgment action seeking a determination that they had no liability to their insureds, defendants Drs. Bruce and Shirley Avery, for "excess insurance" in an amount over $100,000, as the result of an accident in which the Averys' son was struck by an underinsured motorist. The companies maintained the Averys had rejected excess coverage, while Dr. Bruce Avery contended that his signing of a rejection form for additional coverage was the product of a misleading representation by an agent of the companies. The companies appeal from a jury verdict in favor of the Averys. For the reasons that follow, we affirm.
 
 I.
 
 4
 Dr. Bruce Avery and his partners in a medical practice maintained a professional liability insurance policy with the companies through a local agency, the Shafer Insurance Agency. The named insureds were the partnership and each of the partners in the medical practice. Dr. Shirley Avery maintained a separate medical practice and carried her own separate professional insurance.
 
 
 5
 As an added benefit to the professional policy held by Dr. Bruce Avery and his partners, the companies offered a $3,000,000 personal umbrella endorsement. The personal umbrella endorsement covered the Averys and their children who resided with them. At its inception, the policy did not include uninsured or underinsured motorists ("UIM") coverage. In 1982, the Tennessee legislature enacted a statute requiring all umbrella policies issued in the state to include UIM coverage equal to the umbrella amount unless rejected by the insured. The statute had the effect of providing the Averys with $3,000,000 of personal UIM coverage under the personal endorsement to the professional policy.
 
 
 6
 Initially, the companies did not charge any additional premium for the new UIM coverage. But, in April 1986, the companies sent a memo to all its Tennessee agents advising them of the change in Tennessee law and asking them to offer this coverage to all umbrella insureds for an additional premium, or to obtain a rejection of the coverage. In May 1986, Linda Fletcher, a new agent with the Shafer agency, sent a letter and a one-page form entitled "Application for Excess Uninsured Motorist Coverage" to Dr. Bruce Avery's office manager, Beulah Murrah, advising her to have each of the partners complete the form. The form contained boxes which were to be checked to either accept or reject "excess uninsured motorists coverage." Neither the form nor the letter explained the term "excess" as it related to the Averys' policy, however.
 
 
 7
 Dr. Bruce Avery testified that he did not understand the effect of the form so he asked his office manager to telephone the agency to find out its purpose. Murrah telephoned Linda Fletcher and was told that "nothing will change" if Dr. Avery rejected the excess coverage. Fletcher testified at trial that she was unaware that Dr. Avery had $3,000,000 of personal uninsured motorists coverage by operation of law. She believed that Dr. Avery had only $100,000 of primary coverage, and that by signing the rejection form, he would not change the amount of his coverage under the policy. Murrah repeated Fletcher's statement that "nothing will change" to Dr. Avery.
 
 
 8
 Dr. Avery was also under the false impression that the rejection form pertained only to the professional policy and not to his personal endorsement. He testified he was less concerned about the amount of UIM coverage for the business cars since he neither owned nor drove any of the cars. Neither the rejection form nor the letter stated that the form pertained to the personal umbrella endorsement, although Linda Fletcher testified at trial that she had twice told Beulah Murrah in telephone conversations that the rejection form did apply to the physicians' personal umbrella endorsements. Believing both that the rejection form pertained only to the professional policy and that "nothing will change" if he rejected the excess UIM coverage, Dr. Avery signed the form rejecting the coverage.
 
 
 9
 Less than one month later, in July 1986, the Averys' son was injured in a motorcycle accident by an underinsured motorist. The Averys filed a claim but the companies denied liability for any amount over the $100,000 of primary coverage offered by the policy. The companies filed this action seeking a determination that it had no liability for the excess uninsured motorists coverage.
 
 
 10
 At trial, both parties initially proceeded upon the belief that mutual mistake was the theory upon which defendants' relief depended. However, they later realized that while both parties operated under a mistake at the time the rejection form was signed, they were operating under two different and separate mistakes. The agent mistakenly believed that the Averys had only $100,000 of UIM coverage and that rejection of the excess coverage would not change that $100,000 coverage. The Averys, on the other hand, based upon past assurances from the agency, believed they were heavily insured with UIM coverage and mistakenly understood Fletcher's assurance to mean rejection of the "excess" coverage would not change that heavily insured status. The statement "nothing will change," which the agent admitted having made, meant different things to each party.
 
 
 11
 In closing argument, the Averys argued that Dr. Bruce Avery's rejection was the result of a unilateral mistake as to a material fact which was proximately caused by an agent of the companies. They maintained that in rejecting the excess coverage, they relied upon Fletcher's statement that "nothing will change" and but for the statement, would not have rejected the additional coverage. They also contended that they believed Fletcher's statement was true since the parties had a course of dealing in which all major changes in the policy were explained in a personal conference. Since the rejection did in fact change their coverage, they sought rescission of their rejection of the coverage on the ground that they were misled as to the effect of signing the rejection. The Averys also contended in their complaint and in a bench conference prior to closing arguments that relief was proper under the doctrine of equitable estoppel, but the court did not charge the jury on those grounds, saying "you can't use estoppel to create a right."
 
 
 12
 The companies argued that Dr. Avery's rejection was caused not by any mistake made by the agent or by any assurance that "nothing will change," but by his own erroneous belief that the rejection form applied only to the professional policy and the business cars. The companies argued that since the companies did not know of, cause, or in any way induce that belief, reformation of the insurance contract would be improper.
 
 
 13
 On appeal, the companies argue that (1) the district court erred in admitting parol evidence since the rejection form is unambigous on its face; (2) the jury was misled as to the nature of the mistake made by Dr. Avery; (3) the Averys could not have been misled since they did not know the amount of UIM coverage they had by operation of law; and (4) the facts are not sufficient to uphold the jury's conclusion that the companies caused or induced the unilateral mistake. The Averys contend that the facts of this case support the verdict under the doctrines of unilateral mistake and equitable estoppel.
 
 II.
 
 14
 The companies contend that parol evidence can be admitted only after an ambiguity is found to exist in the agreement, and it maintains the UIM rejection form was "plain, simple, and unambiguous" on its face. The companies object to the Averys' testimony as to the meaning they attached to the word "excess," and to their testimony that the companies caused their mistaken belief that "nothing will change" if they signed the rejection form.
 
 
 15
 The term "excess" is not defined or explained in either the rejection form itself, or in the May 27, 1986 letter from the insurance agent to the partnership. The face of the instrument makes no attempt to define the term or explain how it relates to the physicians' policy. The term "excess" has no "plain, simple or clear" meaning independent of its reference. Since the face of the instrument does not state what "excess" referred to, or otherwise explain the term, the parol evidence admitted to show the meaning attached by the parties to the terms did not contradict the language or face of the agreement. The district court did not err in admitting testimony as to the meaning the parties attached to the word "excess."
 
 
 16
 Tennessee case law does not require ambiguity when certain defects in the formation of the agreement are demonstrated; parol evidence can be admitted to contradict or vary the terms or enlarge or diminish the obligation of a written instrument upon a showing of fraud, accident, or mistake. McMillin v. Great Southern Corp., 63 Tenn.App.732, 480 S.W.2d 152, 155(1972). Although Tennessee cases to date have addressed only situations involving mutual mistake, the same rationale would appear to apply equally to allegations of unilateral mistake which, if true, would present grounds for relief under the state's substantive law. See Flippo Constr. v. Mike Parks Diving Corp., 531 A.2d 263, 269 n. 10 (D.C.App.1987); Hancock v. Kentucky Cent. Life Ins. Co., 527 N.Ed.2d 720, 724 (Ind.App.1988); Lipsit v. Leonard, 64 N.J. 276, 315 A.2d 25 (1974); Lacks v. Lacks, 12 N.Y.2d 268, 189 N.E.2d 487, 238 N.Y.S.2d 949 (1963); Restatement (Second) of Contracts Sec. 214(d) (1981) (making no distinction between mutual and unilateral mistake).
 
 
 17
 We also note that when the district court made its ruling on the admissibility of this parol evidence, both parties and the court believed that the doctrine of mutual mistake, rather than unilateral mistake, was at issue. Tennessee has repeatedly permitted parol evidence to prove the existence of a mutual mistake. See, e.g., McMillin, 480 S.W.2d at 155; Retenbach Eng'g Co. v. General Realty Ltd., 707 S.W.2d 524 (Tenn.App. 1985). Accordingly, for these several reasons, we are unable to say that the district court erred in admitting parol evidence for the purpose of allowing the Averys to demonstrate that their mistake as to the effect of the rejection was caused by the insurance companies' agent.
 
 III.
 
 18
 The companies dispute the manner in which the mistake was characterized by defendants and the nature of the mistake which was alleged. It is argue that the relevant mistake was not that "nothing will change if the rejection form is signed" but that Dr. Avery believed the form applied only to the professional policy for the business automobiles. However, a review of his testimony makes clear that he was under a false belief as to both matters. He signed the rejection form because he believed both that "nothing would change," and because he believed it applied only to his professional policy. It was for the jury to determine what part each mistaken fact played in causing Dr. Avery to sign the rejection form, and whether the former mistake, upon which the Averys base their grounds for relief, played a substantial factor in his decision to reject the coverage.
 
 IV.
 
 19
 The companies' next argument is that the Averys could not have been misled since they were not aware that Tennessee had changed the law to require UIM coverage or that the change in law had the effect of providing them with $3,000,000 of personal UIM coverage under their umbrella endorsement. Although the Averys testified that they were not aware of the change in the law and did not know the exact amount of UIM coverage prior to the rejection of the excess coverage, they believed they were heavily insured with UIM coverage, based upon past representations from the agency. Dr. Shirley Avery testified that, after a physician in their community had been killed by a uninsured motorist, she had asked her secretary to call the agency and was at that time specifically assured by the agency that they had a "maximum" amount of UIM coverage. Dr. Bruce Avery testified that he was under a similar belief that they were well-insured, based upon past personal conferences with the agency. Based upon this testimony, a jury reasonably could have inferred that the insurance agency had in the past made specific representations to the Averys regarding the amount of UIM coverage provided by Tennessee law, leaving them with the impression that they had the "maximum" amount of coverage, or that they were heavily insured.
 
 V.
 
 20
 The companies' last assignment of error is that the facts are not sufficient to support a jury verdict on the ground of unilateral mistake. As we have noted, both parties initially believed that mutual mistake was the theory upon which the case was to be tried, but later realized the parties had operated under two different and separate mistakes. Where both parties are mistaken, but their mistakes are materially different, they have operated under unilateral mistakes rather than a mutual mistake. Here, the Averys were operating under a mistake as to a material fact caused by the companies.
 
 
 21
 A unilateral mistake occurs when one of the parties to the exchange has an erroneous belief as to a material fact or basic assumption upon which the contract was made. Where the nonmistaken party neither knew of nor contributed to the other party's mistaken belief, relief is denied. However, "[r]elief from the effect of a unilateral mistake is consistently allowed where one party knows or has reason to know of the other's error and the requirements for rescission are fulfilled." Cofrancesco Constr. Co. v. Superior Components, Inc., 52 Tenn.App.88, 371 S.W.2d 821, 823(1963) (citing other jurisdictions and the First Restatement of Contracts). The formulation under the Second Restatement differs only slightly. Relief is granted where "the other party had reason to know of the mistake or his fault caused the mistake." Restatement (Second) of Contracts Sec. 153(b) (1981).
 
 
 22
 Initially, we must determine whether there is a significant distinction between these two formulations. One may argue that, as drafted by the parties, the jury verdict form conforms to the Second Restatement but not to the Tennessee case law cited above. The form asked whether Dr. Avery's rejection "was or was not proximately caused" by the companies. By their answer, the jury concluded that the companies' agent caused the mistake; not that the agent knew of the mistake she had caused.
 
 
 23
 However, the Tennessee formulation also permits relief if the agent had "reason to know" of the Averys' mistaken belief. Although it is probably the case that one who unknowingly causes a mistaken belief as to a material fact normally would not have "reason to know" that the other party harbors a mistaken belief, we doubt that can be said to be the case under the circumstances of this case. Here, under the facts as found by the jury, the Averys had relied upon the knowledge of insurance and the advice of the companies' agents in the past, the companies' agent made a representation of material fact that was not in accord with the actual facts, and the Averys justifiably relied upon that representation. Obviously, the companies were in the best position to know the true state of the facts. Consequently, how could it be said that the companies did not have "reason to know" the effect the misstatement of fact would have upon the Averys? The Averys relied upon the expertise of the companies' agent when they asked the agent the effect of the rejection form. Accordingly, the companies had "reason to know" of the Averys' mistaken belief, within Tennessee's formulation of the doctrine of unilateral mistake.
 
 
 24
 The same result is compelled by the doctrine of equitable estoppel. As applied to the facts of this case, Tennessee's doctrine of equitable estoppel requires proof of the same facts as the Second Restatement's formulation of unilateral mistake. See Chattem, Inc. v. Provident Life & Accident Ins. Co., 676 S.W.2d 953, 955 (Tenn.1984); 1 S. Williston & W. Jaeger, Williston on Contracts Sec. 139 (3d ed. 1957) ("[A] representation of fact made to a party who relies thereon with the right to so rely may not be denied ... if such denial would result in injury or damage to the relying party."). "[N]egligent silence ... [or] conduct which ... in fact mislead will work an estoppel notwithstanding there was no intention to do so." Lusk v. Consolidated Aluminum Corp., 655 S.W.2d 917, 920 (Tenn.1983).
 
 
 25
 estoppel--that a representation was made by the agent upon which the Averys reli ed to their detriment. Having made a misrepresentation upon which Avery relied, the agency is estopped from disclaiming liability even though there was no in tention to mislead the Averys. Lusk., 655 S.W.2d at 920.
 
 
 26
 The elements of estoppel under Tennessee law are satisfied in this case. Dr. Shirley Avery testified that she had requested and received specific assurances from the insurance agency that the couple had the "maximum" amount of personal UIM coverage under their umbrella policy. Dr. Bruce Avery rejected "excess" UIM coverage in reliance upon the agent's assurance that "nothing will change" if he rejected the coverage. Because the jury found that the agent's representation caused the Averys to reject the additional UIM coverage, the Averys must necessarily have also established the elements of equitable estoppel--that a representation was made by the agent upon which the Averys relied to their detriment. Having made a misrepresentation upon which Avery relied, the agency is estopped from disclaiming liability even though there was no intention to mislead the Averys. Lusk, 655 S.W.2d at 920.
 
 VI.
 
 27
 Accordingly, the judgment of the district court is affirmed.
 
 
 28
 GADOLA, District Judge, joined.
 
 
 29
 KENNEDY, Circuit Judge, concurs in Parts I, II, III of the opinion, and in the judgment.
 
 
 
 *
 The Honorable PAUL V. GADOLA, United States District Judge for the Eastern District of Michigan, sitting by designation