**Herbert G. GEIGER, Appellant,**

v.

**CRESTAR BANK, et al., Appellees.**

**No. 00–CV–265.**

District of Columbia Court of Appeals.

Argued Feb. 14, 2001.

Decided Aug. 23, 2001.

St. John Barrett, Washington, DC, for appellant.

Robert W. Hawkins, Washington, DC, with whom Virginia W. Powell and Richard A. Rice, Jr., were on the brief, for appellees.

Before STEADMAN, FARRELL and REID, Associate Judges.

REID, Associate Judge:

In this case, the conservator of the estate of a person suffering from a mental disability seeks to hold a commercial bank liable for electronic debits against a bank account, approved by the disabled person without the required authorization of the conservator. The bank acknowledged that the disabled person, not the conservator, had authorized the electronic debits, and agreed to recredit the account upon receipt of an appropriate affidavit, as provided for in the account agreement. The conservator declined to submit the affidavit, contending primarily that the debits were unauthorized and that the bank breached the account agreement, as well as its fiduciary obligation. The trial court granted summary judgment in behalf of the bank. We affirm, concluding that the relationship between the bank and the conservator was contractual in nature, not fiduciary, and that the conservator failed to comply with the error resolution procedures of the account agreement.

## FACTUAL SUMMARY

The record before us shows that, after Donald Hinton suffered a serious brain injury in an automobile accident, appellant Herbert G. Geiger was appointed conser-

vator of his estate. Sometime around 1985, Mr. Geiger opened a trust account[1] at the Perpetual American Bank, F.S.B., whose assets later were acquired by appellees Crestar Bank and Crestar Financial Corporation ("Crestar").[2] Mr. Hinton receives a $50.00 weekly allowance from Mr. Geiger, and pays for his own telephone service with cash, but is not authorized to make any charges against the Crestar account; only Mr. Geiger may authorize such charges.

During his deposition, taken in this matter, Mr. Geiger could not recall any discussions he had with the bank at the time he established the account for Mr. Hinton. Nor did he recall whether he alerted the bank to any "restrictions or special safeguards" that should be imposed on Mr. Hinton's account; or whether he received any information about the account. However, Mr. Geiger did remember "a little printed booklet" sent to him after Crestar began handling Mr. Hinton's account around 1990; and he acknowledged that he "probably" was sent any changes in the rules and regulations applicable to the account. When shown a copy of Crestar's Rules and Regulations for Deposit Accounts, and asked whether he ever received it, Mr. Geiger replied: "Yes, I'm quite sure." Mr. Geiger claimed that he informed Crestar of his conservatorship, but could not remember whether he presented the bank with papers appointing him as conservator. Pertinent language in Crestar's rules and regulations concerning incompetents specifies:

Accounts established and maintained for ... incompetents ... must be supported by appropriate legal court documents as we may require for opening or transacting business on such accounts. We assume no duties to beneficiaries of such accounts.

In addition, language in Crestar's rules and regulations which pertains to electronic fund transfers states:

If you authorize any electronic fund transfer (EFT) into or out of your Account, then each EFT transaction is also subject to our Electronic Fund Transfer Rules, a copy of which you will receive when you open your Account. In the event of any conflict between those EFT Rules and these Rules and Regulations, the Electronic Fund Transfer Rules will govern with respect to any EFT transaction. Any transfer made via a local Automated Clearing House (ACH) or other wire or automated payment system shall be additionally subject to the specific rules of that system....

We have the right to make payments on the basis of the beneficiary's stated account number, without assuming any duty to detect or advise you of any inconsistency in the stated beneficiary and the name of the account owner for the specified account number.

Thus, the contractual documents applicable to this matter are: Crestar's Rules and Regulations for Deposit Accounts, the Electronic Fund Transfers ("EFT") regulations (Regulation E), and the National Automated Clearing House Association ("NACHA") operating rules governing Automated Clearing House ("ACH") transactions (collectively, "the account agreement").[3]

1. The account bore the name "Donald J. Hinton Beneficiary, Herbert G. Geiger Conservator For Above."

2. In late 1998, Crestar Financial Corporation merged with SunTrust Banks, Inc., which became SunTrust Bank Holding Company in early 2000. Crestar Bank became part of SunTrust Bank.

3. Mr. Geiger also received an Electronic Transfers Disclosure brochure ("EFT Disclosure brochure") which included explanations of the ACH/NACHA regulations, and the error

Around Spring 1998, years after the bank account was opened, Mr. Hinton received an advertisement for a Quintel Cellular telephone. Mr. Hinton called the toll-free telephone number listed on the advertisement, ordered the cellular telephone, and gave the Crestar account number for billing purposes. Without authorization from Mr. Geiger, and in response to an electronic communication, Crestar began to debit Mr. Hinton's account for "Deduction Services Quintel Cellular." [4]

After discovering the Quintel deductions, Mr. Geiger instructed Mr. Hinton to return the cellular telephone, which he did; advised Crestar, through counsel, of the unauthorized deductions; and requested that the bank restore the funds paid over to Quintel Cellular. On September 11, 1998, Crestar sent a letter to counsel for Mr. Geiger, explaining that: (1) Mr. Hinton had provided accurate account information to Quintel Cellular, and thus had authorized the deductions; (2) to preclude similar future incidents, the account, on which the Quintel deductions were made, should be closed; (3) the bank would credit Mr. Hinton's account, in the amount of the debited sums, upon receipt of an affidavit showing that Mr. Hinton "received no benefit from the 'unauthorized' transactions";

and provided that Mr. Geiger assisted in the recovery of the funds. Counsel for Mr. Geiger declined to take the action requested by Crestar.[5] Crestar repeated its position in a letter dated December 4, 1998, and also informed counsel for Mr. Geiger that: "The transactions in question involve the automatic clearing house process ["ACH"].[6] On an ACH transaction, there is no way to verify an 'authorized signer' beforehand. This has nothing to do with 'disability' and the same rules apply to all other account holders."

Approximately one month later, Mr. Geiger filed a complaint against Crestar in the Superior Court of the District of Columbia, Civil Division, seeking to recover the electronic debits relating to Mr. Hinton's Quintel transaction. He alleged "misappropriation of personal property and breach of trust." He also alleged that he filed the complaint "on behalf of a class consisting of all conservators of estates having trust accounts with Crestar Bank for funds of persons legally disabled from managing their own funds." He demanded injunctive relief, as well as compensatory and punitive damages.

Subsequently, Crestar filed a motion for summary judgment on all counts of the complaint.[7] Mr. Geiger countered with a motion for partial summary judgment, ar-

---

resolution procedures regarding electronic debits.

**4.** The sum of $149.00 was deducted on May 14, 1998, and from July through November 1998, $47.46 per month.

**5.** During his deposition, Mr. Geiger was asked why he did not sign the affidavit. He replied: "I felt it wasn't necessary ... [because] it was the bank that ... had an unauthorized transaction...."

**6.** An ACH is a facility for handling recurring debits and credits that do not involve checks. It is a very large electronic funds transfer system governed by the operating rules of a national organization, the National Automated Clearing House Association ("NACHA").

Crestar is a member of NACHA and is subject to the NACHA operating rules.

**7.** Crestar's motion for summary judgment was supported, in part, by an affidavit from an Assistant Vice President of the bank and an accredited ACH Professional by examination, Anne-Marie J. Leake. Her affidavit explained the ACH Network, and indicated that Crestar "is a member of ... NACHA. As a member of NACHA, Crestar is required to follow the Operating Rules with respect to ACH transactions that it originates or receives." Furthermore, she stated that: "Each of [the] ACH debit entries [on Mr. Hinton's account, which she reviewed,] complied with the NACHA Operating Rules, and Crestar therefore was required to accept them." In addition, she pointed out that, "for a number of years," Mr. Hinton's account had partici-

guing that "there are special circumstances ... that impose on the defendants the obligations of a fiduciary in debiting plaintiff's account through ACH"; and that "[t]he [b]ank clearly breached its deposit agreement when it permitted withdrawals from the plaintiff's account without his authorization." On February 3, 2000, Judge Bartnoff filed an order granting Crestar's motion for summary judgment, denying Mr. Geiger's motion for partial summary judgment, and dismissing Mr. Geiger's complaint. She stated, in part:

> The account included both Mr. Geiger's name as conservator and Mr. Hinton's name as beneficiary, but the account terms did not include any particular restrictions or special safeguards. The account rules provide that if an account-holder establishes and maintains an account for the benefit of an incompetent, Crestar assumes no duties to the beneficiary.

> The account terms further provide that only the authorized signatory—in this case, Mr. Geiger—could draw on the account. But [Mr. Geiger] chose to conduct the majority of transactions involving the account through electronic funds transfers....

> There does not appear to be any basis in the record for [Mr. Geiger's] breach of fiduciary duty claim. The bank does not take on fiduciary responsibilities simply because the bank established an account on behalf of a customer who is acting as a fiduciary. Instead, the relationship of the bank and its depositor is purely contractual. Not only is there nothing in the contract that created a fiduciary responsibility of the bank to Mr. Geiger in this instance, but the account terms specifically provide to the contrary.

Of more concern is that the Bank permitted a withdrawal that was authorized by Mr. Hinton, and not by Mr. Geiger—indeed, it appears that Mr. Geiger initially was not even aware of the electronic withdrawal to Quintel. But this transaction was expressly permitted, under the terms of the account. The account rules expressly provide that funds can be credited to or debited from the account because of ACH entries or other funds transfer entries, which may be subject to additional rules of the funds transfer system that processes those entries. It is undisputed that [Mr. Geiger] received several copies of the account rules and of the electronic funds transfer disclosure. Not only did he not object to the applicability of those rules to the account, but he himself voluntarily made use of ACH transactions relating to the account over a period of several years.

> It is undisputed that the debit entries from Quintel to the account complied with the applicable rules governing ACH transactions. Nothing in those rules (the National Automated Clearing House Association Operating Rules) requires Crestar to obtain written authorization from the plaintiff to approve those transactions or to verify them. Instead, the rules require that Quintel obtain proper authorization. Plaintiff does not contend otherwise....

> [Mr. Geiger] cannot establish a breach of contract by Crestar when the obligation he would impose on Crestar is not contained in the contract.

Mr. Geiger filed a timely appeal.

## ANALYSIS

Mr. Geiger first argues that in granting summary judgment in favor of Crestar and

---

pated in a Bill Payer program under which a third-party vendor, Check Free, received electronic instructions from Mr. Hinton's ac-

count, issued paper checks, then debited the amounts from Mr. Hinton's account by way of an ACH transaction.

denying his motion for partial summary judgment, the trial court clearly erred by "finding ... that the terms of the account expressly permit EFT charges that have not been authorized by [him]. . . ." In essence, he maintains that the bank should not have accepted electronic debits without verifying them, and thus, breached its contract with him. In response, Crestar contends that not only has Mr. Geiger used electronic transfers relating to Mr. Hinton's account, but also that the account agreement provides that such transactions are subject to the EFT rules and regulations (Regulation E) and the NACHA Operating Rules, and that Mr. Geiger failed to follow the procedures for error resolution by declining to submit the affidavit requested by Crestar. To counter these arguments, Mr. Geiger insists that the EFT and NACHA rules apply only to EFT transactions that he authorized, rather than to all EFT transactions; and that "they do not have the force of law [, but] they are simply the banking industry's self-generated operating rules." Mr. Geiger also maintains that Crestar breached its fiduciary duty to him. Crestar insists that its relationship with Mr. Geiger is contractual in nature, not fiduciary.

In his supplemental brief, filed after oral argument, in response to a concern expressed by the court, Mr. Geiger asserts that "the requirement of any affidavit at all [in connection] with an alleged unauthorized [debit] appears beyond the scope of [Crestar's] rules and [regulations] and of its [EFT] Disclosure brochure—and hence beyond the scope of its contract with its depositor." Crestar points out in its supplemental brief that, since Quintel "did not obtain authorization prior to initiating a debit entry, ... Mr. Geiger [ ] is not

without recourse." He may maintain a cause of action against Quintel, or, under the account agreement, seek a recredit of the bank account by "provid[ing] the bank an affidavit declaring that the debit entry was not authorized."

■■■ We turn now to the applicable legal standards and principles. We first address the standard of review for this matter. "In reviewing a motion for summary judgment, 'we must assess the record independently ... [and view it] in the light most favorable to the party opposing the motion.'" *Kelley v. Broadmoor Coop. Apartments*, 676 A.2d 453, 456 (D.C.1996) (quoting *Walton v. District of Columbia*, 670 A.2d 1346, 1353 (D.C.1996)) (other citations and internal quotations omitted). "We will affirm the entry of summary judgment if there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983) (quoting Super. Ct. Civ. R. 56(c)) (internal quotations omitted). Furthermore, whether a contract is ambiguous or unambiguous is a question of law. *Id.* (citation omitted). If the contract is unambiguous, summary judgment is appropriate. *Id.* (referencing *Holland, supra*, 456 A.2d at 815).[8]

■■■ We next identify the legal principles governing the relationship between Mr. Geiger and Crestar. "The relationship between a bank and a depositor is a contractual relationship that is governed by the written agreement between the parties." *Isaac v. First Nat'l Bank of Maryland, D.C.*, 647 A.2d 1159, 1161 (D.C.1994) (referencing *Watts v. American Sec. & Trust Co.*, 47 A.2d 100, 101 (D.C.1946); *Gibson v. Industrial Bank of Washington*,

---

**8.** "We have previously determined that 'a contract is ambiguous when and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different con-
structions or interpretations, or of two or more different meanings. . . .'" *Kelley, supra*, 676 A.2d at 456–57 (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.1973)).

36 A.2d 62, 63 (D.C.1944)). *See also Kiley v. First Nat'l Bank of Maryland*, 102 Md. App. 317, 649 A.2d 1145, 1149 (1994) ("[T]he relationship [between a bank and its customer] ... is that of debtor and creditor, with the rights between the parties considered as contractual, and derived by implication from the banking relationship unless modified by the parties.") (Citation and internal quotations omitted.) Moreover, under the "objective law" of contracts which this court follows, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake." *Isaac, supra,* 647 A.2d at 1162 (quoting *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 786 (D.C.1968)) (quoting *Slice v. Carozza Properties*, 215 Md. 357, 137 A.2d 687, 693 (1958)) (other citations and internal quotations omitted). Furthermore, "a bank generally owes no fiduciary duty to its depositors." *Miller v. American Nat'l Bank & Trust Co. of Chicago*, 4 F.3d 518, 520 (7th Cir.1993) (citations omitted). Moreover, "[t]he mere fact that the deposit was to the knowledge of the depositary made by the depositor in a fiduciary capacity does not make the deposit a special one...." *Corbett v. Hospelhorn,* 172 Md. 257, 191 A. 691, 701 (1937) (citation omitted).

■ The relationship between Crestar and Mr. Geiger in this case is a contractual one. Their contractual relationship is fixed by their account agreement, consisting of Crestar's Rules and Regulations For Deposit Accounts, and the incorporated EFT (Regulation E) and NACHA rules and regulations. Paragraph 1 of Crestar's deposit account rules and regulations stated, in part:

Unless indicated otherwise, these Rules and Regulations apply to all of your Accounts. All deposits in Crestar Accounts are received by us subject to the following Rules and Regulations. By signing our signature card and by continuing to maintain your Accounts, you (or your representative) acknowledge receipt of and an understanding of these Rules and Regulations, and you agree to your Accounts being held subject to these Rules and Regulations and to any future amendments and substitutions to them.

As depositors you agree that you may not change, alter, or terminate your obligations and duties under these Rules and Regulations without obtaining our prior agreement....

Transactions may be additionally governed by specific rules or regulations, as referenced below....

Paragraph 7(F) of Crestar's account deposit rules and regulations specified that: "If you authorize any electronic fund transfer (EFT) into or out of your Account, then each EFT transaction is also subject to our Electronic Transfer Rules, a copy of which you will receive when you open your Account." Thus, not only are the EFT rules and regulations applicable to Mr. Geiger since he acknowledges that he has authorized other EFT transfers, but there is no limitation to EFT transfers authorized only by him, as conservator of Mr. Hinton's estate. In addition, Mr. Geiger was alerted, through Crestar's EFT Disclosure brochure that transfers made through the Automated Clearing House would be governed by ACH rules, both local and national:

Funds may be credited to, or debited from, your Account because of automated clearing house ("ACH") entries or because of other funds transfer entries. These credits and debits may be subject

to additional rules of the funds transfer system that processes such entries, such as the rules of the National Automated Clearing House Association ("NACHA") and local ACH operating rules.

Moreover, Crestar's account deposit rules and regulations also specified that: "Any transfer made via a local Automated Clearing House (ACH) or other wire or automated payment system shall be additionally subject to the specific rules of that system." Therefore, there is no doubt that, under the account agreement, the EFT rules and regulations (Regulation E) and the NACHA operating rules are applicable to the Quintel transaction.

█ Contrary to Mr. Geiger's argument, the incorporated NACHA operating rules and the EFT rules and regulations (Regulation E), together with Crestar's Rules and Regulations for Deposit Accounts, are enforceable and require deference by this court. *See Crestar v. Cheevers*, 744 A.2d 1043, 1048 (D.C.2000) (quoting *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981)) (" '[A]bsent some obvious repugnance to [the underlying legislation], the Board [of Governors of the Federal Reserve System's] regulation implementing [the underlying]

legislation should be accepted by the courts, as should the Board's interpretation of its own regulation' "); (referencing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (" '[D]eference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z' ")). In Mr. Geiger's case, "deference is especially appropriate in the process of interpreting" the Electronic Funds Transfer Act and Regulation E. *Id.* We turn now to those rules and regulations.

█ Under subsections 7.6.1 and 7.6.3 of the NACHA operating rules, if Mr. Geiger submits an appropriate affidavit indicating that the entry against the account was not authorized by him, the bank is obligated to recredit the affected account, as Crestar acknowledges.[9] These subsections are generally consistent with the EFT rules and regulation (Regulation E), issued by the Board of Governors of the Federal Reserve System, which implements the Electronic Transfer Act, 15 U.S.C. § 1693 *et seq.* (1994)[10]

The Electronic Transfer Act "establishes the basic rights, liabilities, and responsibilities of consumers who use electronic fund

9. Subsection 7.6.1, *Receiver's Right to Recredit*, provides in pertinent part that:
    For all consumer entries … [the bank] must promptly credit the amount of a debit entry to a consumer account of a Receiver if (1) the Receiver sends or delivers to the [bank] a written affidavit as described in subsection 7.6.3 (Receiver Affidavit) that the debit entry was not authorized by the Receiver, and (2) this affidavit is sent or delivered to the RDFI within 15 calendar days from the date the [bank] sends or makes available to the Receiver information relating to the debit entry. …
    Subsection 7.6.3, *Receiver Affidavit*, specifies, in part:
    A Receiver must execute an affidavit, in the form required by the [bank], declaring and

swearing under oath that (a) for all consumer entries … the debit entry for which the Receiver is seeking recredit under this section 7.6 was not authorized by the Receiver. …

10. Both the Truth in Lending Act and the Electronic Funds Transfer Act, and their implementing Regulations Z and E, were designed to protect consumers. While there may be some "regulatory overlap" between Regulation E and Z, there are "significant differences in the error resolution procedures of the two regulations, and in their applicability." *See* Comptroller of the Currency Banking Bulletin, BB–80–11, 1980 OCC CB LEXIS 45, at 3–4; 87 Federal Reserve Bulletin 323 (No. 5, May 2001), § 205.12.

transfer services and of financial institutions that offer these services."[11] 12 C.F.R. § 205.1(b) (2001). Section 205.11 of Regulation E concerns the resolution of errors. 12 C.F.R. § 205.11 (2001). Subsection 205.11(b)(2) authorizes the bank to require the consumer to submit written confirmation of any claimed error:

> A financial institution may require the consumer to give written confirmation of an error within 10 business days of an oral notice. An institution that requires written confirmation shall inform the consumer of the requirement and provide the address where confirmation must be sent when the consumer gives the oral notification.

12 C.F.R. § 205.11(b)(2). The official staff interpretation of § 205.11(b)(2) confirms the right of the bank to request "a written signed statement from the consumer relating to a notice of error." 12 C.F.R. Part 205, Supp. 1, § 205.11, ¶ 11(b)(1)(2). However, the bank "may not delay initiating or completing an investigation pending receipt of the statement." *Id.* Paragraph 5 of Crestar's rules and regulations, which places the onus on the depositor to notify the back of any "errors" or "forgeries,"[12] is consistent with § 205.11(b)(2).

Paragraph 7 (F) of Crestar's account deposit rules and regulations safeguards Crestar's "right to make payments on the basis of the beneficiary's stated account

---

11. The Act states:

> It is the purpose of this subchapter [15 U.S.C. § 1693 *et seq.*] to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. The primary objective of this subchapter, however, is the provision of individual consumer rights.

15 U.S.C. § 1693(b). Generally, the Act provides a cause of action for an accountholder for unauthorized electronic transfers, including debit transactions using the ACH system. *See* 15 U.S.C. §§ 1693a (6) (definition of electronic fund transfer); 1693f (error resolution); 1693m (civil liability). It is generally applicable to transfers in and out of a consumer asset account. Consumer liability is strictly limited, and the burden of proof in establishing consumer liability, as a rule, falls on the financial institution. *See* 15 U.S.C. § 1693g.

Mr. Geiger and Crestar do not address the question whether the account established by Mr. Geiger is a "consumer asset account," within the meaning of the Act. *See* 15 U.S.C. § 1693a (2); 12 C.F.R. § 205.2 and Official Staff Interpretation, § 2(b)(2) 1 and 2; Benjamin Geva, The Law of Electronic Fund Transfers § 6.04[2][c][iii], at 6–53 (2000). Since neither party has focused on this question, we assume, without deciding, that the Act is applicable to the Crestar account at issue in this case. We note, however, that the Act defines "an unauthorized electronic transfer" as "an

electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a (11).

12. Paragraph 5 provided:

> You are expected to examine your account statement, records or notices upon receipt. Any forgeries, errors or problems on your account must be brought to our attention within 14 days of the statement date or the making of the entry in your passbook. We will not be responsible for any future problems or forgeries by the same wrongdoer if you fail to notify us within 14 days of the statement showing the first problem or forgery. We will not be responsible for any forgeries of your signature, regardless of the wrongdoer's identity, that are not brought to our attention within 60 days of the statement date. You must notify us in writing within 12 months of the statement date of any forgeries of endorsements of payees other than yourself or we will not be liable. If you seek reimbursement or otherwise make a claim against the bank, you agree to provide such affidavits, testimony and assistance as the bank deems necessary to pursue an action against any third party.

Paragraph 15 of the Electronic Fund Transfer Disclosure rules contains requirements relating to the resolution of electronic fund transfer errors, including notification, investigation and explanation by the bank.

number, without assuming any duty to detect or advise you of any inconsistency in the stated beneficiary and the name of the account owner for the specified account number." Similarly, under paragraph 2(D), Crestar "assume[d] no duties to beneficiaries of . . . accounts [for incompetents]."[13] Paragraph 3 of Crestar's EFT Disclosure brochure asked the depositor to notify the bank of any electronic fund transfers that were not authorized;[14] and paragraph 11 of the brochure, relating to "automated clearinghouse transfers and other fund transfers," explicitly stated: "[W]e will not give you notice of the receipt of an entry, except when we have agreed in writing to do so or when required by applicable law."

We see nothing in the record to indicate that the account agreement was modified in any manner in behalf of Mr. Geiger to create a fiduciary or special relationship with Crestar. During his deposition in this case, Mr. Geiger acknowledged that he received a copy of Crestar's Rules and Regulations for Deposit Accounts, including any changes in that document, as well as Crestar's EFT Disclosure brochure which contained a discussion of error resolution procedures and an explanation of the ACH system. He did not recall discussing these rules and regulations with anyone at Crestar. Although Mr. Geiger maintained at oral argument that he filled out a form restricting his authorization of electronic fund transfers, the record does

not contain any such document. Furthermore, during his deposition in this case, he was asked whether he "advise[d] the [bank] branch manager of any restrictions or special safeguards that [he] wanted placed on the account?" He responded: "I don't recall." Nor did he remember whether he discussed electronic fund transfers with the branch manager when he opened the bank account in behalf of Mr. Hinton. He "probably had a discussion about limiting the authority to write checks at the time that [h]e got the checks," but could not recall, "[a]fter opening the account, [whether he] ha[d] any communication [with bank] representatives about the terms of the account." However, he was asked: "After opening the account, did you have any communications with [bank] representatives about the terms of the account?" He replied: "No." Nonetheless, Mr. Geiger maintained that when Crestar took over Perpetual, he informed Crestar that he "was conservator and that [he] would be the only one who had access to this account." He did not remember submitting any documents to Crestar concerning his role as conservator for Mr. Hinton; nor did he discuss with Crestar "any restrictions or special safeguards that [he] wanted placed on [the] account." He acknowledged that "the majority of payments from the [bank] account [in Mr. Hinton's behalf] . . . [were] made via the [Telephone] Bill Payer service. . . ."[15]

---

13. Paragraph 2(D) also contained the following requirement: "Accounts established and maintained for . . . incompetents . . . must be supported by appropriate legal documents as we may require for opening or transacting business on such accounts."

14. Paragraph 3 stated, in part:
  [S]hould your statement show Transfers that you did not make, please tell us immediately. If you do not tell us within 60 days after the statement was mailed, you may not get back any of the money you lost if we can

show that we could have stopped the Unauthorized Transfer(s) if you had notified us in time.

15. During oral argument, counsel for Mr. Geiger indicated that a form had been submitted to the bank limiting those to whom payments could be made under the Telephone Bill Payer program. This limitation is not discussed in the excerpts from Mr. Geiger's deposition transcript that are included in the record on appeal.

■ We conclude that the account agreement was unambiguous and established a contractual relationship between Mr. Geiger and Crestar. As the trial court found, nothing in the record before us reveals any special circumstances giving rise to a fiduciary or special relationship between Mr. Geiger and Crestar. In *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F.Supp. 1018 (D.D.C.1994), the court indicated that: "The existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of the contractual obligations." *Id.* at 1028 (referencing *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 741, 769 (S.D.N.Y. 1990)). We detect no facts in this case detailing a history of interaction between Mr. Geiger and Crestar which extended their relationship beyond the provisions of the account agreement. On the contrary, Mr. Geiger's deposition shows virtually no interaction between him and the Bank.

Under the account agreement, Crestar readily agreed that, technically, an unauthorized transfer had occurred, and stated its readiness to credit Mr. Geiger's account, provided that he take certain action, including submitting an appropriate affidavit, which Crestar had a right to request under the account agreement. By declining to submit the affidavit, Mr. Geiger, rather than Crestar, breached the account agreement. Thus, he cannot now complain that the Quintel electronic debits were not recredited to the account.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*