DSP VENTURE GROUP,
INC., Appellant,

v.

Richard M. ALLEN, Jr., et al. Appellee.

No. 02–CV–906.

District of Columbia Court of Appeals.

Argued June 10, 2003.
Decided Aug. 21, 2003.

Robert J. Sher, for appellant.

Ferguson Evans, Washington, DC, for appellees.

Before STEADMAN, FARRELL and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

This appeal arises from a suit for breach of a contract for the sale of real estate. The contract purchaser, DSP Venture Group, Inc. (DSP), sued the seller, Richard M. Allen, Jr., seeking specific performance and damages for his refusal to complete settlement on the contract. The trial judge found the contract unenforceable on the ground that there was no meeting of the minds on a material term, namely the period of time in which the settlement was to take place. As we see it, the sole issue is whether appellee Allen's unilateral mistake as to a contractual obligation of the purchaser entitled him to avoid the contract. We conclude not and reverse, remanding the case for further proceedings.

## I.

On March 11, 2002, Richard Allen and David Parreco, the president of DSP, executed a "Standard Purchase and Sales Agreement" for the sale of real property located at 46 Channing Street, N.W., in the District of Columbia for $120,000. DSP gave Allen a $1,000 deposit. At the time, Allen was the sole legatee of the property pursuant to the last will and testament of the title owner, his grandmother Minnie Louise Allen. The parties anticipated that Allen promptly would initiate probate of his grandmother's will and be appointed personal representative of her Estate in order to be in a position to proceed to settlement.

Paragraph 10 of the contract between Allen and DSP dealt with "Title Examination and Time for Closing." Subparagraph 10(A) had a blank space for a closing date to be filled in, and provided that the transaction would be closed on or before that

date if the title evidence and survey confirmed that the seller was vested with a marketable title. A handwritten insertion specified that the closing would occur in thirty days, "subject to processing of will and probate such that seller has secured good title." Subparagraph 10(B) provided, however, that if the title evidence and survey revealed "any defects which render the title unmarketable," then the buyer would have seven days to notify the seller of such defects. In such event Allen, the seller, "agree[d] to use reasonable diligence to cure such defects at Seller's expense and will have 30 days to do so, in which event this transaction will be closed within 10 days after delivery to Buyer of evidence that such defects have been cured." Paragraph 20 of the contract provided that there were "no other agreements, promises or understandings between these parties."

After signing the contract, Allen did not take steps immediately to commence a probate proceeding for his grandmother's Estate. Meanwhile, within seven days of signing the contract, DSP notified Allen that the title search had disclosed an unreleased lien on the property that needed to be cured in order to close the sale. Eventually the document necessary to clear the lien from the title was located and the defect cured. DSP advised Allen that it was ready to proceed to settlement as soon as Allen, in his capacity as Personal Representative, conveyed title to himself as legatee.

On March 29, 2002, Allen was appointed personal representative of the Estate of Minnie Louise Allen. Five days later, repudiating his contract with DSP,[1] Allen entered into a new contract to sell the Channing Street property to third parties for $25,000 more than the price for which he had agreed to sell it to DSP. DSP brought suit in Superior Court against Allen to prevent the sale and enforce its own contract with him.[2] The court issued a temporary restraining order at DSP's behest and thereafter held an evidentiary hearing on DSP's motion for a preliminary injunction.

Allen testified at the hearing that he signed his contract with DSP based on his understanding that the closing would take place within seven days no matter what. Allen explained that he had read a DSP direct-mail brochure advertising its ability to close on real estate transactions in seven days,[3] and that he told Parreco that he wanted to settle in that time period because he was behind on his mortgage payments and feared an imminent foreclosure on the Channing Street property.[4] Allen acknowledged that the contract did not contain an absolute seven-day closing requirement, but stated that he did not read the contract when he signed it. Allen also testified (arguably inconsistently) that the handwritten notation in Subparagraph 10(A) that closing would occur in thirty days, subject to his securing good title in probate, was not in the contract at the time he signed it.

1. Allen apparently was advised that his contract with DSP was legally invalid for lack of capacity on his part to sell property belonging to the Estate. The trial court in this case rejected that claim of invalidity, and Allen has not advanced it in this appeal as a viable alternative ground on which to affirm the judgment in his favor.

2. DSP sued Allen both individually and in his capacity as personal representative.

3. The brochure was not in evidence at the hearing.

4. So far as appears in the record before us, no foreclosure proceedings were ever instituted on the property at any time relevant to the issues before us.

Parreco acknowledged that Allen told him that a prompt closing was important to him because of his fear of foreclosure, but he denied committing DSP to a seven-day closing deadline. Rather, Parreco testified that he explained to Allen that he needed to initiate probate and become the personal representative before they could close on the sale. Parreco said that he and Allen agreed that the closing would take place within thirty days; "[Allen] was anxious to have it done sooner, and I made it clear to him that I would assist him to any extent that I could to, you know, expedite the process." Parreco testified that he memorialized the discussion before Allen signed the contract by writing in Subparagraph 10(A) that the closing would occur within thirty days "subject to processing of will and probate, such that seller has secured good title." Parreco further testified that he explained the contract terms to Allen and went over each page of the contract with him. Parreco thereafter arranged for Allen to meet with an attorney to assist him with the probate matter. Parreco also described the subsequent discovery of the title defect and the communication of that discovery to Allen.

The trial court credited Allen's testimony. It found that the handwritten language appearing in Subparagraph 10(A)[5] was not in the contract at the time Allen signed it, and that the contract therefore did not "contain any specific date for settlement." The court also found that Allen genuinely believed that the closing under the contract was to be in seven days, although "it may have not been a reasonable expectation." Nonetheless, "because there was a difference between these two men about when they would close," the court concluded that "there was no valid meeting

of the minds," and "as a matter of law ... the contract was void or voidable for failure to state a material term regarding the time for closing." The court denied DSP's motion for preliminary injunction and, on the parties' representation that the evidentiary record was complete on the issue of whether Allen had breached a valid contract, entered final judgment in favor of Allen.

## II.

 Accepting the trial court's findings of fact, DSP argues that Allen's mistake regarding the contractual deadline for closing did not render the contract void or unenforceable. The question presented is one of law, on which our review is *de novo. See, e.g., Sacks v. Rothberg,* 569 A.2d 150, 154–55 (D.C.1990). We are constrained to agree with DSP and reverse. This jurisdiction follows what has been called the "objective" law of contracts, which generally means that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *Geiger v. Crestar Bank,* 778 A.2d 1085, 1091 (D.C.2001) (internal quotation marks and citations omitted). Whatever Allen intended, the sales contract he signed did not contain a seven-day closing requirement. The written language of the contract was not ambiguous, either, even accepting the trial court's finding that the handwritten insertions in Subparagraph 10(A) were added subsequently and should be disregarded. When a contract does not specify a time for perform-

---

**5.** DSP furnished the only copy of the contract in the record and the only copy that the trial court examined.

ance, that ordinarily does not render the contract ambiguous; the law implies a reasonable time. *See Flack v. Laster*, 417 A.2d 393, 400 (D.C.1980); RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. d (1981) ("Where the contract calls for a single performance such as the rendering of a service or the delivery of goods, the time for performance is a 'reasonable time.' "). Moreover, on the facts of this case, Subparagraph 10(B) resolved any residual uncertainty about the time for performance, since DSP triggered that provision when it notified Allen of the cloud on title within seven days.[6]

Nor were grounds of fraud or duress shown (or found by the trial court) as a basis for avoiding the written language of the sales contract. The most that can be said is that Allen was mistaken about what the contract he signed provided.[7] But the mistake was not a mutual one—the trial court did not find that DSP shared Allen's misapprehension about an unconditional seven-day closing deadline. *See* RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (1981) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.").

What, then, was the effect of Allen's unilateral mistake? A party to a contract is entitled to void the contract on account of that party's unilateral mistake only when certain conditions are met. According to RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981), which this court adopted in *Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 272 (D.C.1987),

[w]here a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

A party to a contract "bears the risk of mistake" under § 154 when, among other things, "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient."[8] *Id.*

Allen did not present sufficient evidence to support a finding (which the trial court did not make) that he met the requirements of § 153. In the first place, Allen

---

6. There is no claim that DSP breached any obligation to close within the time frame specified by Subparagraph 10(B).

7. For purposes of applying doctrines of mutual and unilateral mistake, we will assume that a "mistake" may include "[a]n erroneous belief as to the contents or effect of a writing that expresses the agreement." RESTATEMENT (SECOND) OF CONTRACTS § 151 cmt. a (1981).

8. Section 154 reads in full as follows:
A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

RESTATEMENT (SECOND) OF CONTRACTS § 154 (1981).

did not show that his mistake about the closing deadline had "a material effect" that was "adverse to him." There is no indication that Allen was prejudiced in any way by the fact that the contract did not require DSP to close the transaction within seven days. Further, it seems to us incontrovertible that Allen bore the risk of his mistake, because he knowingly did not bother to read the contract he signed. *See Pers Travel, Inc. v. Canal Square Assocs.,* 804 A.2d 1108, 1110–11 (D.C.2002) ("We have, however, consistently adhered to a 'general rule that one who signs a contract has a duty to read it and is obligated according to its terms.'") (citation omitted). Allen had to be aware when he made the contract that his knowledge of what it said regarding time for performance was "limited," yet he nonetheless "treat[ed] his limited knowledge as sufficient." Finally, Allen did not show either that enforcement of the contract would be "unconscionable," or—even accepting that he told Parreco of his strong desire to settle within seven days—that DSP had "reason to know" of his mistake or was at "fault" in causing it.

We conclude that Allen did not have the option of voiding his contract with DSP on the ground of his unilateral mistake regarding the time for settlement. We reverse the judgment in Allen's favor and remand for further proceedings.

*So Ordered.*