Paul TAUBER and Phyllis Tauber, Appellants,

v.

Tin QUAN and Minto, Inc., Appellees.

No. 04–CV–891.

District of Columbia Court of Appeals.

Argued Jan. 3, 2006.
Decided Dec. 20, 2007.

---

John J. McDermott, for appellants.

Benny L. Kass, Washington, DC, for appellees.

Before REID, GLICKMAN and FISHER, Associate Judges.

GLICKMAN, Associate Judge:

This is an appeal from an award of summary judgment and specific performance in a suit to enforce an agreement to sell commercial real estate. The reluctant sellers, appellants Paul and Phyllis Tauber, argue that the agreement is too indefinite to be enforced. Alternatively, appellants assert that they were entitled to

avoid the contract because they signed it by mistake. Appellants further claim that specific performance should have been denied because the purchaser, appellee Tin Quan, had unclean hands, and because the trial court held an evidentiary hearing on that issue without proper notice.

Concluding that appellants' contentions lack merit, we affirm the judgment on appeal.

## I.

The commercial property at issue is located at 2412 18th Street, N.W., in the District of Columbia neighborhood of Adams Morgan, and we shall refer to it as the "Adams Morgan property." The owners, Paul and Phyllis Tauber, employed an attorney, Eric Sayles, to manage the Adams Morgan property and to assist them with its sale. Paul Tauber is an experienced real estate investor.

Tin Quan is a restaurateur in Adams Morgan. He hoped to purchase the Adams Morgan property from the Taubers in order to relocate his restaurant there.[1] Quan engaged David Crowley of Randall H. Hagner & Co., a real estate brokerage firm, to help him acquire the property.

Quan and Crowley negotiated with Paul Tauber and Sayles over a period of five months, from September 2002 through January 2003. The protracted negotiations culminated in a multi-page standard form Sales Contract dated September 3, 2002, and a General Addendum to that contract prepared by Crowley in January 2003.[2] The General Addendum modified the terms of the September 3 Sales Contract in a few respects. Notably, the General Addendum reduced the purchase price stated in the Sales Contract from $699,900 to $625,000.[3] This change was attributable, at least in part, to the purchaser's discovery that the Adams Morgan property was encumbered by a long-term, below-market lease, which reduced its market value and impaired Quan's ability to secure independent financing. The Taubers agreed to finance the transaction themselves by taking a first deed of trust note from Quan in the principal amount of $550,000. The essential provisions of that note, including the interest rate, the amount of the monthly payment, and the due date, were spelled out in the General Addendum. Quan agreed to pay the balance of the purchase price, $75,000, in cash at settlement, and to deposit $46,250 in escrow as good faith earnest money.

The General Addendum provided that Quan rather than the sellers would pay the 4.5% brokerage fee. This modification of the September 3 Sales Contract partially offset the reduction of the purchase price (the fee would have been $28,125). The General Addendum also expressly stated that Quan would be responsible for paying transfer and recordation taxes.

As set forth in the General Addendum, settlement was to occur no later than Feb-

---

1. Appellee Minto, Inc., is the corporation to which Quan intended to convey the Adams Morgan property after acquiring it.

2. Shortly before the parties executed the General Addendum at the end of January 2003, Quan sued the Taubers in Superior Court for breach of contract. Among other things, the General Addendum was intended to resolve this litigation; it provided that Quan would dismiss his lawsuit after the parties went to closing.

3. Paragraph 4 of the General Addendum reads as follows: "Contract sales price changed to six-hundred twenty-five thousand and no cents ($625,000) of which $75,000 is cash to seller at settlement and $550,000 shall be due and payable as a first trust payable to seller; payment terms referenced previously in the ratified contract [the September 3 Sales Contract]."

ruary 18, 2003. Quan stood to forfeit his entire deposit of $46,250 if he was unable to settle on the property by that date. The General Addendum provided that the Taubers were to pay "appropriate fees" to their attorney, Eric Sayles, to prepare the closing documents.[4] The General Addendum further stated that "[n]o contingencies exist in this contract...."

Tin Quan signed the General Addendum on January 30, 2003. Paul and Phyllis Tauber each signed it the following day. At that time, Paul Tauber personally inserted two handwritten clarifications relating to the terms of the $550,000 note,[5] which Quan initialed to signify his assent. Thus, the agreement to sell the Taubers' Adams Morgan property to Quan was fully executed on or about January 31, 2003.

The Taubers refused to go to settlement with Quan, however. In a letter to David Crowley, Paul Tauber asserted that the General Addendum did not "reflect the arrangement made by you and me." Tauber stated that the total purchase price "according to our agreement" was to be $724,000, adding that the "only reason I agreed to change the listed contract price was to save the buyer some fees and have a separate contract for the remainder of the total price." More specifically, Tauber claimed, Quan was supposed to pay Eric Sayles' fees in addition to the purchase price and the brokerage fee. Accordingly,

Tauber concluded, "I will not go to settlement if you do not include Mr. Sayles in the second part of this sale, i.e., the other costs above the net amount due me of $625,000."[6]

Quan did not accede to Tauber's demand that he pay Sayles. In the ensuing litigation[7] to compel the Taubers to sell their Adams Morgan property in accordance with the September 3 Sales Contract and the General Addendum, the trial court eventually granted partial summary judgment in favor of Quan on his breach of contract claim. Rejecting the Taubers' legal defenses, the court ruled on March 10, 2004, that the parties had made "a valid and binding contract" which the Taubers were "not entitled to void" on the basis of their unilateral mistake.

Although the court thus found the Taubers liable for breach of contract, it declared itself undecided as to whether to compel specific performance. Opposing such equitable relief, the Taubers had claimed that Quan and Crowley had "sought to lower the purchase price by the artifice of paying costs [i.e., brokerage and attorney's fees] out of closing" in order to "cheat" the District of Columbia out of transfer, recordation, and other real estate taxes (which would be based on the consideration paid for the Adams Morgan property). In view of this allegation of "unclean hands," the court ordered the parties

---

4. The amount of Sayles' "appropriate fees" was not otherwise stated in the parties' agreement. In his deposition, Paul Tauber estimated somewhat casually that Sayles might have received $20,000 to $25,000 for his services in negotiating and papering the transaction. The record does not otherwise indicate how much Sayles might have earned.

5. One of the handwritten interpolations confirmed the interest rate of 7%, and the other specified that the note would contain a prepayment penalty provision applicable during the first three years.

6. Tauber's letter was written on January 31, 2003, the same day on which he and his wife executed the General Addendum. However, it is undisputed that the contract was finalized before Tauber sent his letter repudiating the transaction.

7. Quan amended his pending Superior Court complaint against the Taubers, see footnote 2, *supra*, to allege breach of the General Addendum.

to appear for a hearing on April 15, 2004, to address whether Quan was entitled to specific performance.

After listening to the arguments of counsel on April 15, the trial court asked to hear testimony. Without objection from the Taubers' counsel, Quan and Crowley each took the stand. Crediting their testimony, the court found that they had not tried to structure the transaction to defraud the government of taxes.[8] Accordingly, rejecting the Taubers' "unclean hands" defense, the court ordered specific performance and directed the parties to advise it within ten days whether it would need to appoint a trustee to finalize the seller financing documents. Pursuant to a provision of the September 3 Sales Contract, the court subsequently awarded reasonable attorney's fees and costs to Quan as the prevailing party. The Taubers have appealed the trial court's rulings to this court.

## II.

■■■ We first address the order granting partial summary judgment on Quan's breach of contract claim, as to which our review is *de novo*.[9] Summary judgment "shall be rendered" if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[10] The evidence is to be viewed in the light most favorable to the non-moving party.[11]

■■■ "[S]ummary judgment is appropriate where a contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence."[12] "While it is commonly said that contracts are to be construed to effectuate the intent of the parties, where a contract is unambiguous, 'intent is properly an objective, not subjective, issue.'"[13] In other words, "[t]his jurisdiction follows what has been called the 'objective' law of contracts, which generally means that 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.'"[14]

■■■ The contract before us in this case is the September 3 Sales Contract, which is conceded to be a standard form contract for the sale of real estate in widespread use in this jurisdiction, as modified by the January 31 General Addendum. The Tau-

---

8. Rather, the court found, no costs were concealed and all that "occurred here was an effort by Mr. Crowley after learning additional information about the tenants in the property and how the leases had been structured to provide complete information to [his] client Mr. Quan so that Mr. Quan would have all of the information in front of him concerning the transaction and be able to understand exactly what he was doing and how much things were costing and what the actual costs of the building would be as opposed to ... the purchase price that had been discussed."

9. *See Washington Props. v. Chin, Inc.,* 760 A.2d 546, 548 (D.C.2000).

10. Super. Ct. Civ. R. 56(c).

11. *Allen v. Yates,* 870 A.2d 39, 44 (D.C.2005).

12. *Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983).

13. *Washington Props.,* 760 A.2d at 548 (quoting *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988)).

14. *DSP Venture Group, Inc. v. Allen,* 830 A.2d 850, 852 (D.C.2003) (quoting *Geiger v. Crestar Bank,* 778 A.2d 1085, 1091 (D.C.2001)).

bers have characterized this contract as both ambiguous and too indefinite to be enforced, but it is neither.

Whether a contract is ambiguous is a question of law.[15] "[A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."[16] In addition, "[a] contract must be sufficiently definite as to its material terms (which include, e.g., subject matter, price, payment terms, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonably certain."[17] But "[t]he requirement of definiteness cannot be pushed to extreme limits," because "[a]ll agreements have some degree of indefiniteness and some degree of uncertainty."[18] Thus, "[a]ll the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy."[19] There need be only "[r]easonable definiteness in the essential terms of a purported contract" so that a court may determine "whether a breach has occurred" and "an appropriate remedy."[20]

Notwithstanding their broad claims, the Taubers do not point to any ambiguous language in their contract with Quan, and the only indefiniteness they cite is the failure of the contract to specify the default terms of the first deed of trust note (which their attorney, Eric Sayles, was to prepare for the closing). The omission of the default terms is not enough to render the contract unenforceable, however.

The contract does specify the payment terms to be included in the note, which are as follows. The principal balance of $550,000 is to be payable with interest at the rate of 7% per annum in 120 monthly installments of $4,264.14. The payments are to be due on the first day of each month, a late fee of 10% of the unpaid amount is to be charged after the seventh day of the month, and the entire unpaid balance is to become due if any payment is not received within thirty days. Bounced checks are to incur a 10% penalty, and any prepayment during the first three years is to be subject to a 25% penalty assessed against the unpaid principal amount. By themselves, these provisions are definite enough to be enforceable. Default provisions, such as "[t]erms providing for how parties will allocate attorneys' fees incurred in seeking redress for a breach of contract[,] are not necessary for the parties to understand how they are expected to perform the contract itself."[21] "Thus, they were not material, and did not undermine the binding nature of the agreement...."[22] Furthermore, even if the parties expected to negotiate over possible default terms, "the mere fact that a contract, *definite in material respects,* contains some terms which are sub-

15. *Washington Props.,* 760 A.2d at 548.

16. *Id.* (internal quotation marks and citations omitted).

17. *Rosenthal v. Nat'l Prod. Co., Inc.,* 573 A.2d 365, 370 (D.C.1990) (citations omitted).

18. *Id.*

19. *Id.* (quoting *V'Soske v. Barwick,* 404 F.2d 495, 500 (2d Cir.1968)).

20. *Id.*

21. *Duffy v. Duffy,* 881 A.2d 630, 636 (D.C. 2005).

22. *Id.* at 636 n. 8.

ject to further negotiation ... will not bar a decree for specific performance." [23] In such cases, the contract is construed to mean that the parties would agree upon reasonable terms, which a court can ascertain (if necessary) from evidence of usage in the trade.[24]

■ We turn to the Taubers' alternative contention, that they were entitled to avoid the contract with Quan under the "unilateral mistake" doctrine. The Taubers claim that they signed the General Addendum under the mistaken belief that Quan was to pay Eric Sayles' fee, as well as the brokerage fee (which Quan did agree to pay). Supposedly these payments were to be in separate transactions "outside the closing." [25] This claim is hard to fathom, inasmuch as the General Addendum explicitly divided the responsibility for paying the two fees between Quan and the Taubers. Moreover, contrary to the assertion that side transactions were intended, the General Addendum further states that "[n]o contingencies exist in this contract...." The Taubers argue that Quan's agreement to pay Sayles separately is "the only explanation for the precipitous drop in price" from $699,900 in the September 3 Sales Contract to $625,000 in the General Addendum. The record reveals

other explanations for that price reduction, however, including Quan's discovery after offering the higher figure that the Adams Morgan property was encumbered by a long-term, below market lease, and Quan's agreement to pay the $28,125 brokerage fee.

In any event, "[a] party to a contract is entitled to void the contract on account of that party's unilateral mistake only when certain conditions are met." [26] Those conditions are set forth in the RESTATEMENT (SECOND) OF CONTRACTS §§ 153 and 154 (1981).[27] Section 153 provides:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

23. *Hackney v. Morelite Constr., D.C. Corp.*, 418 A.2d 1062, 1068–69 (D.C.1980) (emphasis in the opinion) (quoting *Ammerman v. City Stores Co.*, 129 U.S.App. D.C. 325, 330, 394 F.2d 950, 955 (1968)). In *Hackney*, which involved a contract for the sale of real estate, we rejected the contention that there was no valid agreement on the price merely because *the parties had not agreed on "certain incidental factors,"* such as which party would pay the closing costs and transfer taxes.

24. *See, e.g., id.* at 1068. It also is worth noting that the omission of some default terms may be remedied by statute. For example, D.C.Code § 15–108 (2001) compensates for the failure to specify a post-default interest rate for the note by providing that in

an action "to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid."

25. David Crowley may have discussed such a possibility with Paul Tauber in the course of contract negotiations.

26. *DSP Venture Group*, 830 A.2d at 853.

27. *See Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 272 (D.C.1987) (adopting the RESTATEMENT (SECOND) OF CONTRACTS approach).

Section 154 provides, *inter·alia,* that "[a] party bears the risk of a mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient...."

■■ We agree with the trial court that the Taubers did not show that they might be able to satisfy the requirements of the unilateral mistake doctrine. First, as in *DSP Venture Group,*[28] "it seems to us incontrovertible" that the Taubers bore the risk of their alleged mistake. Whether they signed the General Addendum without reading it,[29] or read it and disregarded its explicit provisions addressing the payment of their attorney and the absence of any contingencies, the Taubers necessarily treated their knowledge of the contract terms as sufficient. Furthermore, the Taubers did not present evidence that enforcement of the contract would be "unconscionable,"[30] that Quan "had reason to know" of their alleged mistake before they consummated the contract, or that Quan's "fault" caused their mistake.

As the contract is valid and enforceable, and not avoidable on grounds of mistake, we uphold the trial court's grant of partial summary judgment to Quan.

### III.

The trial court awarded specific performance because it credited the testimony of Quan and Crowley and found that they did not try to structure the purchase of the Adams Morgan property so as to defraud the District government of taxes. We defer to the trial court's credibility assessments and will not set aside its factual findings unless they are clearly erroneous.[31]

■■ Specific performance is an equitable remedy, and the decision whether or not to order it is "confided to the 'sound and informed discretion' of the trial court."[32] "Specific performance of a contract is ordered when the legal remedy, usually money damages, is deemed to be either inadequate or impracticable. When land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, since each parcel of land is unique...."[33] Thus, it is routine for courts to enforce contracts to purchase real estate by ordering that they be specifically performed.

■■ We have no difficulty sustaining the trial court's award of specific performance in this case. First, we reject the Taubers' claim that they were unfairly sur-

---

**28.** *See* 830 A.2d at 854.

**29.** As a rule, "one who signs a contract has a duty to read it and is obligated according to its terms." *Pers Travel, Inc. v. Canal Square Assocs.,* 804 A.2d 1108, 1110–11 (D.C.2002) (citation omitted). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 157, cmt. b ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms."). In the present case, it is evident that Paul Tauber did read the General Addendum before signing it, for he made two handwritten changes to it.

**30.** We note in this connection that Quan presented evidence that the purchase price of $625,000 was considerably above the assessed value of the Adams Morgan property.

**31.** *Murphy v. McCloud,* 650 A.2d 202, 209 (D.C.1994); *see* D.C.Code § 17–305 (2001).

**32.** *Independence Mgmt. Co., Inc. v. Anderson & Summers, LLC,* 874 A.2d 862, 867 (D.C. 2005) (quoting *Drazin v. Am. Oil Co.,* 395 A.2d 32, 34 (D.C.1978)).

**33.** *Flack v. Laster,* 417 A.2d 393, 400 (D.C. 1980) (footnotes omitted); *accord, Independence Mgt. Co.,* 874 A.2d at 870.

prised by the court's request for testimony on the issue at the April 15, 2004, hearing, which they did not attend in person. This claim is raised for the first time on appeal. The Taubers' counsel, who was present at the hearing, neither objected to the taking of testimony from Quan and Crowley at that time, nor asked for a continuance to enable him to present his clients' testimony or other evidence for the court's consideration. His only stated concern was that the testimony of Quan and Crowley be recorded, which it was. We therefore conclude that the Taubers' procedural objection to the taking of testimony has been forfeited.[34]

■ Second, though the Taubers invoke the equitable maxim that specific performance is not available to one who has acted fraudulently in the transaction,[35] the trial court found that Quan and Crowley did not intend to commit tax fraud. That factual finding is not clearly erroneous; it is supported by Quan's and Crowley's testimony, which the court credited. We are not prepared to hold that the court plainly erred merely because the General Addendum allocates the broker's fee to the purchaser, and thus excludes the amount of that fee from the stated purchase price.[36]

## IV.

For the foregoing reasons, we affirm the judgment of the trial court, including its award of reasonable attorney's fees and costs.

34. *See Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C.1986) ("As a general rule, matters not properly presented to a trial court will not be resolved on appeal.... A court deviates from this principle only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record.") (citations omitted).

35. *See, e.g., Goldfarb v. Marchionne,* 12 Mass. App.Ct. 933, 425 N.E.2d 401, 402 (1981) (refusing specific performance of contract for purchase of real estate because the parties deliberately misstated the price in the contract in order to mislead the taxing authorities). *See generally Synanon Foundation, Inc. v. Bernstein,* 503 A.2d 1254, 1264 (D.C.1986) (quoting, *inter alia, Keystone Driller Co. v.*

*General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)).

36. Indeed, the Taubers do not attack the court's factual findings as being unsupported. Instead, they argue that if Quan and Crowley were not trying to defraud the District government by misrepresenting the real purchase price for the Adams Morgan property, they must have been undertaking to defraud the Taubers themselves into accepting a lower price for that property. While we see no evidentiary support for this claim, we shall not consider it further, because it was not presented first to the trial court. *See Williams v. Gerstenfeld, supra* footnote 34.